# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
ROBERT WALTER SCULLY,
Defendant and Appellant.

S062259

Sonoma County Superior Court
SCR-22969

May 24, 2021

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Liu, Cuéllar, Kruger, Groban, Jenkins, and Jackson[*] concurred.

---

[*]  Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. SCULLY

S062259


Opinion of the Court by Cantil-Sakauye, C. J.


A jury convicted defendant Robert Walter Scully of the first degree murder and robbery of Sonoma County Deputy Sheriff Frank Trejo.  (Pen. Code, §§ 187, 211.)[1]  The jury found true the special circumstance allegations that defendant committed the murder for the purpose of avoiding arrest (§ 190.2, subd. (a)(5)) and while engaged in the commission of a robbery (§ 190.2, subd. (a)(17)), and that defendant intentionally killed a peace officer engaged in the performance of his duties (§ 190.2, subd. (a)(7)).  The jury also convicted defendant of the possession of a short-barreled shotgun (former § 12020, subd. (a)), possession of a firearm as a convicted felon (former § 12021, subd. (a)(1)), burglary (§ 459), assault with a firearm (§ 245, subd. (a)(2)), and six counts of false imprisonment (§§ 210.5, 236).  It found true the allegations that defendant was armed with and personally used a firearm in the commission of each of the offenses.  (Former §§ 12022, subd. (a)(1), 12022.5.)  It also found true that defendant suffered three prior strike convictions (§ 1170.12), seven prior serious felony convictions (§§ 667, subd. (a), 1192.7, subd. (c)), and had served three prior prison terms (§§ 667.5, subds. (a) & (b)).

Following a penalty trial, the jury returned a verdict of death. The trial court denied defendant's motion for a new trial and

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1

application to modify the judgment, and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

We conclude defendant's claims of error lack merit, and therefore affirm his convictions and death judgment. We remand the matter for resentencing to strike a three-year prior prison term enhancement and otherwise affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

##### a. Murder of Deputy Frank Trejo

On March 29, 1995, at approximately 11:30 p.m., Deputy Trejo informed dispatch that he was stopping a suspicious truck in the Santa Rosa Saddlery (Saddlery) parking lot. Brenda Moore was driving the truck; defendant was in the passenger seat. At 11:36 p.m., dispatch communicated with another deputy to check the status of Deputy Trejo. Shortly thereafter, the first officer arrived at the Saddlery parking lot and found Deputy Trejo dead in front of his patrol car, lying facedown on his stomach in a pool of blood. The deputy's arms were positioned above his head, his fists were clenched, and his legs were pointed straight back. The deputy's gun belt, weapon, radio, and flashlight were missing. His patrol car headlights were off, and the vehicle spotlight was on and turned toward the highway.

Several people witnessed the events leading to the shooting of Deputy Trejo. Jesus Alejandro Ramirez Gutierrez (Ramirez),[2] Onesimo Guerrero Tavarez (Guerrero), Oscar Gustavo Aguilar Lopez (Aguilar), Rhonda Robbins, and Kellie Jones were in the R&S Bar

---

[2]     The defense introduced evidence that Ramirez had engaged in past criminal conduct amounting to a misdemeanor.

parking lot when they noticed a sheriff's patrol car parked behind a green pickup truck in the adjacent lot. They saw defendant pointing a shotgun at Deputy Trejo while Moore removed the deputy's radio and gun belt from him. Moore reached inside the deputy's patrol car, turned off the headlights, and moved the spotlight toward the sky. Several of the witnesses observed the deputy kneel down on the ground with his arms raised. Robbins and Jones saw defendant shoot Deputy Trejo in the face at a close range. Ramirez, Guerrero, and Aguilar also heard a gunshot; Ramirez noticed a flash come from defendant's weapon, and saw the deputy's body jump. They watched as defendant and Moore quickly returned to the pickup truck and drove away.

Early the next morning, police officers located Moore's truck abandoned in a church parking lot in Santa Rosa. In a marshy area between Moore's truck and where defendant was later apprehended, police collected a police radio, gun belt, and flashlight belonging to Deputy Trejo.

Forensic pathologist Dr. Ervin Jindrich performed the autopsy on Deputy Trejo. He determined the cause of death was a single gunshot wound to the head. Dr. Jindrich could not state with certainty the exact position of Deputy Trejo's body in relation to the shooter, but he was able to conclude that the deputy more or less faced the barrel of the shotgun. The large defect in the deputy's head indicated that he was shot at close range. Numerous pellets from the shotgun shell were embedded in Deputy Trejo's head, and one pellet had penetrated the distal shoulder. Dr. Jindrich opined that the single pellet in the shoulder could have occurred if the deputy's arm was elevated above his head. Brain tissue was found on the back of the deputy's left hand, indicating that his hand was in front of his body and parallel to his shoulders when shot.

Criminologist Richard Waller testified that a shot cup, the plastic component of a shotgun shell, was recovered from the deputy's body during his autopsy. Waller determined the shot cup was fired from defendant's sawed-off shotgun. He also concluded that the distance from the muzzle of the gun to Deputy Trejo was approximately nine to 10 feet. He further resolved that the blood spatters on the deputy's clothing were consistent with high velocity impact spatter. Scuff marks on the toe area of the deputy's boots indicated that there was force coming from the heel toward the front toe area. Given the muzzle-to-target distance, the presence of brain matter and glass fragments on the deputy's body and clothing, and the location of the blood spatters, Waller concluded that the deputy was not in a prone position when he was shot.

### b. Crimes at Frank Cooper and Yolanda King's residence

At approximately 1:30 a.m. on March 30, 1995, hours after the killing of Deputy Trejo, defendant and Moore entered the Santa Rosa home of Frank Cooper and his fiancée, Yolanda King.[3] The couple and their family — Yolanda's son Jeremy, daughter Karen, and Karen's toddler son and infant daughter — were asleep. Frank was awakened by the sound of the back door being kicked in. He left his bedroom to check on the noise and was confronted by defendant, who pointed a shotgun at Frank's head and shouted at him to get down on his knees or he would "blow [his] goddamn head off." Yolanda, who was still in their bedroom, asked Frank to comply. At defendant's direction, Frank awakened his family and gathered them in Karen's bedroom. Defendant repeatedly told them not to use the phone or look out the window, or someone would "get hurt."

---

[3] For clarity, we refer to members of the Cooper/King family by their first names.

Defendant was armed with a sawed-off shotgun and a pistol. He unloaded the pistol, placed the bullets in socks, and tucked the socks into his waistband. Moore went downstairs to make a phone call.[4] The Cooper/King family remained in Karen's bedroom for approximately five hours. At 6:30 a.m., defendant allowed Frank to leave the bedroom to make coffee. Frank told defendant that Jeremy had a medical appointment at 7:30 a.m. and suspicions would arise if they did not appear at the appointed time. Defendant permitted Frank and Jeremy to leave, but warned Frank that the rest of the family was still at the house and if anything went wrong, defendant would kill them.

Upon leaving his home, Frank was stopped by law enforcement blocking the road. He was able to bypass the police officers and reach his ex-wife's house, where he telephoned his son and ultimately contacted the police. Per police instructions, Frank called his house and told defendant that he had run out of gas and needed Yolanda to bring a gasoline can and money to a location in downtown Santa Rosa. Defendant allowed Yolanda to leave, but he would not permit her to take Karen's children outside. Following several telephone calls from a police hostage negotiator and assurance that they would not be harmed, defendant and Moore surrendered and were arrested.

During a search of the Cooper/King residence, evidence specialists found a sawed-off shotgun bearing defendant's right palm print and Deputy Trejo's revolver and speed loader. Specialists also recovered from the field surrounding the residence a pair of brown boots and a maroon backpack containing some clothing, a

---

[4] At approximately 3:00 a.m., Moore telephoned her neighbor, relating to her that defendant "had killed a cop" and was holding "them" hostage.

handkerchief, sunglasses, and a black purse with Moore's driver's license.

### c. *Conspiracy to commit robbery and attempted robbery of Marian Wilson*

Marian Wilson and Sung Won Kim owned Sushi Hana, a restaurant in Sebastopol. On March 30, 1995, Wilson read about the shooting of Deputy Trejo in the newspaper. She recognized the description of the pickup truck and suspects from an incident that had occurred near her restaurant the previous evening.

On March 29, 1995, Wilson and Kim closed Sushi Hana at around 9:00 p.m. and proceeded to clean the restaurant and close out the cash register. Wilson left to go shopping at the nearby Safeway at approximately 10:00 p.m. On the drive back to Sushi Hana, Wilson observed a green pickup truck parked around the corner from the restaurant with defendant and Moore seated inside. Wilson parked across the street from Sushi Hana and went inside to collect the briefcase that contained the day's receipts and mail. As she returned to her car, she noticed the same green pickup truck was now parked directly in front of her vehicle. As Wilson hurried to her car, defendant and Moore got out of the truck and walked toward her. Wilson got into her vehicle and circled the block; upon her return, she saw the green truck headed toward Highway 12. Wilson returned to collect Kim, who had heard an old car with a loud engine coming down the alley next to the restaurant while Wilson was away. Kim perceived the vehicle stop in front of the restaurant for at least 20 seconds. Kim looked out the window and noticed that the vehicle was a truck.

The prosecution introduced evidence of defendant and Moore's possession of a loaded shotgun, watch caps, latex gloves, a pair of binoculars, and several road maps for Vallejo, Napa, and Sonoma County that had writings or markings on them. An enlarged view of Santa Rosa had several areas circled or blacked out with pen.

As discussed in more detail below, defendant was charged with conspiracy to commit robbery and attempted robbery of Wilson, but he was acquitted on the attempted robbery charge and the court declared a mistrial on the conspiracy count.

### d. Prior felony convictions

In a bifurcated proceeding, the prosecution presented evidence of defendant's prior serious felony convictions, prior strike convictions, and prior prison terms. The jury found the allegations true.

### 2. Defense evidence

Defendant did not deny shooting Deputy Trejo, but testified that it was an accident. He also presented evidence intended to show that prison living conditions had deleteriously impacted his state of mind.

On March 24, 1995, a few days before Deputy Trejo was shot, defendant was released from Pelican Bay State Prison (PBSP) after having spent more than a decade in prison. He was ordered to report to his parole officer in San Diego by March 27. Moore picked up defendant from prison and offered to drive him at least part of the way to San Diego.

Defendant stayed at Moore's home in Crescent City for two days. During this time and unbeknownst to Moore, defendant found a sawed-off shotgun in an old van near Moore's home. Defendant was aware that it was unlawful for him to possess a firearm as a convicted felon, and that it was unlawful for anyone to possess a sawed-off shotgun. Nevertheless, he kept the gun for protection because he feared attack from the enemies he had made in prison and from unknown enemies outside prison.

On March 26, defendant and Moore left Crescent City and arrived in Santa Rosa that evening. Because Moore's truck had mechanical problems, the pair stayed in motels for the next few days awaiting repair of the truck. Defendant was aware that he was late

in reporting for parole and admitted that he did not call the San Diego parole office or look for a local parole office to explain the problems he was having in getting to San Diego to report on time.

On March 29, Moore decided that she would drive defendant only as far as San Francisco. On the way to San Francisco that evening, Moore got lost driving out toward the coast. She drove to Sebastopol and told defendant she wanted to return home. Defendant became upset and yelled at Moore, insisting that she drive him to San Francisco. Moore continued to drive around in circles as they argued. Moore finally stopped the truck in the Saddlery parking lot. Almost immediately, Deputy Trejo pulled in behind them and shined a spotlight on the truck. Defendant testified that he panicked and tried to convince Moore to drive away, but Moore had already stopped the vehicle.

As defendant attempted to hide the shotgun, Moore exited the truck to speak with the deputy. Moore returned to the vehicle to retrieve her driver's license and Deputy Trejo approached the passenger side of the truck. When the deputy asked defendant to exit the truck, defendant got out pointing the shotgun at the deputy. He ordered Deputy Trejo to put his hands up. The deputy began to walk backward toward his patrol car. Defendant told the deputy to freeze, chambered a round in the shotgun, and directed the deputy to kneel. Defendant then disarmed Deputy Trejo by ordering him to unbuckle his gun belt and remove it. He testified that he intended to disarm the deputy, not to steal the gun belt or items on the belt.

Deputy Trejo followed defendant's direction to lie down on the ground. Defendant began to walk backward toward the pickup truck, still pointing the shotgun in the deputy's direction. According to defendant, he tripped and fell, which caused the shotgun to hit his leg and discharge before it hit the ground. When defendant stood up, he saw that Deputy Trejo had been shot in the face and was dead.

Defendant testified that he did not aim the shotgun at the deputy nor intend to shoot him. Defendant returned to the pickup truck and drove off with Moore.

Criminologist Peter Barnett testified for the defense. Based on his analysis of the physical and forensic evidence collected in the investigation of Deputy Trejo's death, Barnett concluded that the deputy was lying down when he was shot. Barnett explained that the absence of evidence of falling blood and the position of the deputy's body suggested that he just collapsed from some slightly higher position and fell straight down.

Five inmates incarcerated at PBSP and housed in the Security Housing Unit (SHU) testified about prison conditions. Inmates in the SHU were kept isolated for 23 hours a day, given an hour and a half for yard exercise, and fed meals in their cells. It was common for inmates to experience paranoia and have enemies in prison; prison guards reinforced these perceptions by telling inmates that they had enemies. As a result, inmates were fearful about being released and running into another former inmate.

Dr. Stuart Grassian testified regarding the psychiatric effects of long-term solitary confinement or housing in the SHU. He found that inmates housed in the SHU tended to be extremely anxious, antisocial, and hypervigilant, develop panic attacks, and experience hallucinations. Based on his interview with defendant, Dr. Grassian concluded that defendant's thinking was narrow, rigid, and obsessive by the time he was released from PBSP, and that he was helpless in the outside environment. Defendant was upset and distressed when he spoke with Dr. Grassian about the shooting of Deputy Trejo.

## B. Penalty Phase Evidence

### 1. Prosecution evidence

The prosecution's case in aggravation included evidence regarding defendant's violent criminal history, both in and out of custody, and victim impact testimony.

Diane K. testified that on October 4, 1978, defendant entered her apartment while she slept and raped her. As Diane K. struggled with defendant, he hit her in the face and chest and attempted to strangle her.

The prosecution also presented evidence that defendant and an accomplice committed a series of armed robberies of bars and restaurants in the San Diego area over the course of two weeks in December 1981.

Additionally, the prosecution presented evidence of several instances of defendant's prior violent conduct while incarcerated. In May 1983, defendant stabbed another inmate, who suffered puncture wounds on his shoulder. When investigating the incident, a correctional officer discovered that a portion of the bars on defendant's cell was missing. In February 1984, defendant was involved in a physical altercation with another inmate during which the inmate sustained stab wounds to his torso. In April 1984, defendant rushed toward a correctional officer with an inmate-manufactured spear. The following month, defendant stabbed another correctional officer with an inmate-manufactured weapon. Three hacksaw blades wrapped in plastic were subsequently discovered inside defendant's rectum. In August 1990, defendant and another inmate physically assaulted a third inmate at the SHU yard at Corcoran State Prison. In October 1996, defendant threw a milk carton containing urine on three correctional officers while he was in custody at the Sonoma County jail.

Over defense objection, the prosecution presented victim impact evidence through the testimony of five members of Deputy Trejo's family and two members of the Cooper/King family. Deputy Trejo's children described the close relationship they had with their father and how his death impacted their lives. Deputy Trejo's wife, Barbara, described the grief and loss she felt after her husband died. Kevin Cooper described the physical and emotional toll that the hostage incident had taken on him. And Karen King described the impact that the hostage incident had on her relationship with her family and her interactions with new people.

### 2. *Defense evidence*

In mitigation, the defense focused on the effects of defendant's childhood and background on his behavior and the psychological effects of having been incarcerated for nearly 13 years in the SHU or in solitary confinement.

Several members of defendant's family testified. Robert Scully, defendant's father, testified that he divorced defendant's mother when defendant was two or three years old and he did not have much contact with defendant until recently. Robert Scully admitted to struggling with alcoholism and acknowledged that his own father was also an alcoholic.

Lola Bobby, defendant's sister, testified that their family home was very stressful and disruptive due to the abusive relationship between their mother and stepfather, who were both alcoholics. The children frequently saw their mother and stepfather engaging in violent fights. Defendant left home when he was 11 or 12 years old. Defendant's mother, Sally Pike, and his other sisters, Marilyn Beall and Patricia Scully, also briefly testified to show their support for defendant.

Defendant's juvenile probation officer described defendant's home life as "emotionally impoverished," explaining that defendant's mother was overwhelmed by her abusive marriages and unable to deal with defendant and his three sisters. Defendant had no positive male role model or father figure in his life, nor any support at school or in the community.

Two PBSP inmates testified concerning conditions in the prison's SHU. They described their life there as filled with monotony, isolation, and fear.

Dr. Craig Haney, a professor of psychology at the University of California, Santa Cruz, testified about the causes of violence in institutional settings and the psychological effects of living in maximum security prisons. He described defendant's incarceration history in various penal institutions and opined that an individual such as defendant, who was continuously incarcerated in a SHU facility or in solitary confinement for more than a decade, would endure continuous and forced isolation and either become mentally ill or "institutionalized" — that is, dependent on the routines, practices, and logic of the prison environment. He explained that for inmates who have been deeply institutionalized as a result of SHU confinement, it is a disabling and frightening experience to be released from prison. He opined that such inmates are often unprepared to deal with the real world and do very poorly when they are out of prison.

## II. DISCUSSION

### A. Pretrial and Guilt Phase Issues

#### 1. *Denial of motions for change of venue*

Defendant contends the trial court erroneously denied his two motions for a change of venue in violation of his rights to due process and to a fair trial by an impartial jury under the Sixth and Fourteenth

Amendments to the United States Constitution. We conclude there was no error.

### a. Background

Defendant was arrested and charged in Sonoma County, where the alleged offenses occurred. He moved for a change of venue approximately 13 months later, in May 1996, arguing that a fair and impartial trial could not be had in the county because of the extensive publicity the case had received. At a hearing on the motion, experts for the prosecution and defense testified about their respective survey findings based on telephonic surveys they had conducted.

Dr. Edward Bronson testified for the defense regarding the results of a venue survey he had designed to determine the extent to which the media affected the community's prejudgment of defendant in Sonoma County. The results of Bronson's survey, conducted in January 1996, showed that 335 of 402 respondents recognized the case, a rate of approximately 83 percent. Of those who recognized the case, approximately 78 percent believed defendant was either "definitely guilty" or "probably guilty," and 59 percent viewed death as the appropriate penalty. Bronson concluded that members of the community were familiar with many details of the case widely covered by the media, and that the rate of prejudgment of guilt increased with the number of specific details recalled. Based on his review of nearly 140 news articles about the case, Bronson described the media coverage as highly inflammatory, largely appealing to people's emotions, and containing inadmissible material as well as inaccurate coverage that presumed defendant's guilt. He recalled the media's description of the crime as an "execution-style slaying," the depiction of defendant as a PBSP parolee and a "cold-blooded killer," and the portrayal of Deputy Trejo's death as a strike against the entire community. He noted that media coverage was concentrated in the Press Democrat, the main local newspaper.

Dr. Ebbe Ebbesen testified for the prosecution regarding the results of his own venue survey as well as his review of Dr. Bronson's survey findings. Ebbesen surveyed individuals in Sonoma County and San Diego County, using San Diego as a comparison county with little exposure to publicity about defendant's case. Ebbesen's survey results showed a recognition rate of 68 percent in Sonoma County and 14 percent in San Diego County. But, he reported, the majority of Sonoma residents who stated familiarity with the case actually had a very shallow knowledge of the facts when asked to recount specific details. When questioned specifically about defendant's guilt in this case, 70 percent of those surveyed in Sonoma and 47 percent in San Diego thought defendant was definitely or probably guilty. However, Ebbesen related, when individuals were given a definition of first degree murder and the reasonable doubt standard in considering defendant's guilt, there was virtually no difference between the two counties in the likelihood a respondent believed defendant was guilty. In both counties, 85 to 90 percent of respondents indicated they could set aside what they knew about the case and be impartial. There were also no differences between the two counties regarding respondents' views on the penalty defendant should receive if he were found guilty. Ebbesen's survey also showed an identical percentage of individuals in both counties who were willing to change their opinions about guilt when confronted with new evidence.

Dr. Ebbesen criticized Dr. Bronson's survey for failing to measure respondents who were unfamiliar with the case but would still find defendant guilty based on their general attitudes toward criminal justice. He also disagreed with Bronson's assumptions about the extent of people's knowledge concerning the case and the breadth of publicity. Ebbesen theorized that most people start with a presumption of guilt, which may have caused the high percentage of "definitely" or "probably" guilty responses in Sonoma County. He also

opined that there could be reasonable alternative explanations for hostility against defendant that were not necessarily publicity induced, such as the emotional nature of the crime — the murder of a police officer.

Dr. Ronald Dillehay testified for the defense in rebuttal. After reviewing both survey results, Dillehay concluded that Dr. Bronson's methodology and conclusions were valid, and Dr. Ebbesen's survey was too long and complex.

Following the hearing, the trial court denied defendant's motion without prejudice, subject to renewal after voir dire. It deemed the surveys too speculative, and declined to consider them in its analysis. Based on its review of the 68 newspaper articles submitted by the defense, the court ruled that the pretrial publicity was not inflammatory or pervasive enough to warrant a change of venue.

Jury selection began in October 1996. Approximately 800 prospective jurors were summoned. After a majority of the jury pool was excused for hardship, 197 prospective jurors remained. Based on their written responses to questions in the jury questionnaire regarding pretrial publicity, 163 of the 197 prospective jurors recognized the case, a rate of approximately 83 percent. Thirty to 40 prospective jurors were subsequently excused by stipulation. After the remaining prospective jurors were questioned regarding their knowledge of the case from pretrial publicity as well as their death penalty views, the jury pool was further reduced to 88.

Defendant renewed his motion for change of venue in mid-November 1996, a few days before the completion of jury selection — and approximately 19 months after the charged crimes occurred. He claimed the questionnaire responses and individual voir dire showed that pretrial publicity continued to have an effect on the community

and jury venire. The court waited to rule on the motion until after the completion of jury selection.

Once both sides declined to exercise further peremptory challenges and accepted the panel, defendant asked the court to revisit the motion.[5] According to defense counsel, approximately 85 percent of the potential jurors who had completed the questionnaire recognized the case. This included 14 of the 18 seated jurors and alternates, a recognition rate of approximately 77 percent.[6]

The court denied defendant's renewed motion. In so ruling, the court explained that it had carefully reviewed the written questionnaire responses of prospective jurors, individually questioned them about the influence of the pretrial publicity on their opinions and their ability to be impartial, and observed their demeanor during voir dire. It found that the venire did not demonstrate the level of pretrial publicity necessary to disqualify them as a group of prospective jurors. It separately considered the written and oral responses to pretrial publicity questions from the seated and alternate jurors, and ruled that defendant failed to meet his burden of proving that he could not receive a fair trial based on the responses of the actual jurors selected.

### b. Discussion

On a defendant's motion, the court shall order a change of venue "when it appears that there is a reasonable likelihood that a fair and

---

[5] The defense had 14 available peremptory challenges that it did not use.

[6] Nine of the 12 seated jurors were familiar with the case based on pretrial publicity. One of the nine jurors who had knowledge of the case was excused by stipulation due to hardship after the jury reached a verdict on the guilt phase, but prior to defendant's bifurcated trial on the alleged prior convictions.

impartial trial cannot be had in the county." (§ 1033, subd. (a); see *People v. Panah* (2005) 35 Cal.4th 395, 447 (*Panah*).) In deciding whether to change venue, a court must consider "the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's prominence." (*People v. Rountree* (2013) 56 Cal.4th 823, 837 (*Rountree*).) "Political overtone" factors, if present, may also be a pertinent consideration. (See *People v. Harris* (2013) 57 Cal.4th 804, 822 (*Harris*); *Maine v. Superior Court of Mendocino County* (1968) 68 Cal.2d 375, 387 (*Maine*).)

"On appeal, the defense bears the burden of showing both error and prejudice. It must establish a reasonable likelihood both that a fair trial could not be had at the time of the motion, and that the defendant did not actually receive a fair trial." (*People v. Smith* (2015) 61 Cal.4th 18, 39 (*Smith*); see *People v. Rices* (2017) 4 Cal.5th 49, 72 (*Rices*).) "[W]e accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county." (*Rountree, supra,* 56 Cal.4th at p. 837.)

### i. Nature and gravity of the offense

The "nature" of an offense refers to the " 'peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community.' " (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1159 (*Hamilton*).) The "gravity" of an offense refers to " 'its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict.' " (*Ibid.*; see *Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582.)

Here, the gravity of the offense, capital murder, weighs in favor of a venue change. Yet we have repeatedly held that this factor is not dispositive (*Rountree, supra,* 56 Cal.4th at p. 837), and have rejected

calls to establish a presumption of a venue change in all capital cases (*People v. Sanders* (1995) 11 Cal.4th 475, 506). Indeed, " 'every capital case involves a serious charge. While this factor adds weight to a motion to change venue, it does not in itself require a change.' " (*People v. Hart* (1999) 20 Cal.4th 546, 598.)

The nature of the offenses — a single fatal gunshot fired at close range and the subsequent taking family members hostage before releasing them — were not particularly aggravated in comparison with other capital murders. There were certainly gruesome details, but nothing approaching the sensational overtones of other cases in which we have upheld the denial of venue motions. (*Smith, supra,* 61 Cal.4th at p. 40; see also *Rountree, supra,* 56 Cal.4th at p. 838; *People v. Ramirez* (2006) 39 Cal.4th 398, 407, 434–435 (*Ramirez*).) The fact that the victim was a police officer likewise does not require a venue change. (*People v. Jenkins* (2000) 22 Cal.4th 900, 943; *Rices, supra,* 4 Cal.5th at p. 72; *Odle v. Superior Court* (1982) 32 Cal.3d 932, 941 (*Odle*) [" 'brutal stabbing' " of a young woman and murder of a police officer were "not . . . the type of multiple and bizarre killings that were the object of media attention" that would weigh in favor of a venue change].)

### ii. *Nature and extent of media coverage*

We next consider the nature and extent of the media coverage, the factor upon which defendant primarily relies. Defendant contends the pretrial publicity was so extensive, sensational, and prejudicial that it was reasonably likely that a fair and impartial trial could not be had in Sonoma County.

" 'When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." ' "

(*Rices, supra,* 4 Cal.5th at p. 74, quoting *Skilling v. United States* (2010) 561 U.S. 358, 386.) In the case below, the trial court considered the 68 newspaper articles submitted in support of defendant's motion for change of venue. The court described the reporting as "extensive and detailed within the first two weeks of the killing," but pointed out that "[t]hey tapered off in number and frequency as time passed" and "there was no reporting between the various court appearances." It also observed that several of the articles submitted by defendant did not at all relate to his case and some of the others merely mentioned him or Deputy Trejo peripherally. The court found the media coverage to be predominantly factual, intermittent, and not inflammatory or sensationalized.

The court compared the nature and extent of the media coverage in this case to that in *Odle, supra,* 32 Cal.3d 932, which also concerned the killing of a police officer. In *Odle,* the defendant presented approximately 150 newspaper articles containing potentially inflammatory and prejudicial information, including local and regional papers covering the funeral of the slain officer and reports on pretrial proceedings and developments. (*Id.* at p. 939.) We concluded that a change of venue was not warranted in light of the lengthy period of time between the initial two-week period of extensive media coverage and the change of venue motion. (*Id.* at p. 940.) Citing *Odle,* the trial court found that the media coverage of defendant's case did not warrant a change of venue.

We have reviewed the 68 newspaper articles attached to defendant's first motion for change of venue and agree with the trial court's assessment of the media coverage in this case. Several articles described defendant as a parolee, violent felon, career criminal, or reputed member of the Aryan Brotherhood. They also characterized the murder of Deputy Trejo as "cold-blooded" and "execution-style." Each, however, took care to refer to defendant as "suspected" or

"accused" of "allegedly" shooting the deputy. Most of these articles, which were generally factual, fair, and not inflammatory, were published within the first several months following defendant's arrest.

As the trial court observed, the pretrial publicity in this case demonstrates less hostile and less pervasive media coverage than in *Odle*. Defendant submitted less than half the number of articles presented in *Odle*, and a majority were published within the first several months following his arrest. Indeed, we have repeatedly upheld the denial of change of venue motions in numerous cases involving a similar or greater degree of media coverage. (See, e.g., *People v. Famalaro* (2011) 52 Cal.4th 1, 22 (*Famalaro*) [289 newspaper articles and editorials and television coverage on all major stations]; *People v. Prince* (2007) 40 Cal.4th 1179, 1210–1214 (*Prince*) [270 newspaper articles and extensive television coverage]; *People v. Sully* (1991) 53 Cal.3d 1195, 1237 [193 newspaper articles, 300 pages of television transcripts, and eight videotapes].) In *People v. McCurdy* (2014) 59 Cal.4th 1063, 1077 (*McCurdy*), for example, we concluded that the nature and extent of the media coverage — approximately 60 newspaper articles published about defendant's case, a third of which appeared in the first few months following his arrest — did not heavily favor a change of venue. Similarly, we upheld the trial court's denial of a change of venue motion in *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 44, 46 (*Coffman and Marlow*), even though the defense presented more than 150 articles from regional newspapers and several videos of television coverage of the case. We observed that the media coverage "substantially predated the trial" and all of the seated jurors who remembered hearing about the case indicated during voir dire that pretrial publicity would not prevent them from acting fairly and impartially. (*Ibid.*)

Moreover, the publicity in this case was not so inflammatory as to preclude a fair trial. " 'Media coverage is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case.' [Citation.] Although 'press coverage need not be inflammatory to justify a change of venue . . .' [citation], something more than sensational facts has been present in cases in which a change of venue was required." (*People v. Suff* (2014) 58 Cal.4th 1013, 1048 (*Suff*); see also *People v. Zambrano* (2007) 41 Cal.4th 1082, 1126 [Although "local coverage disclosed the brutal details of the crimes, and elicited their effects on the victims and their families, the reporting was essentially factual, not sensationalized"].) We have previously held that media descriptions of crimes as "execution-style murders," " 'brutal,' 'cold-blooded,' 'evil,' 'horrible,' or 'horrific' " were not by themselves necessarily prejudicial when they appeared in generally factual and noninflammatory reporting. (*Rices*, *supra*, 4 Cal.5th at p. 73.) Similarly here, the media description of defendant as a "cop killer," "violent criminal," or "state parolee," and characterization of the crime as "cold-blooded" or "execution-style" does not approach the type of incendiary reporting that would warrant a change of venue.

Nor does the media's description of defendant's reputed Aryan Brotherhood affiliation or recounting of his criminal history warrant a venue change. There are approximately 10 articles, published over the course of nearly 18 months, that mention defendant's alleged affiliation with the Aryan Brotherhood or white supremacist group. Most were published within the first three weeks following Deputy Trejo's killing. The articles made only passing reference to defendant's Aryan Brotherhood connection, which was largely described as "alleged" or "reputed." In addition, in response to written questions regarding media coverage of the case, only a handful of the 197 prospective jurors stated they recalled defendant's alleged

affiliation with a white supremacist group.  In *Coffman and Marlow*, we upheld the denial of a motion for change of venue, even though much of the reporting "characterized defendants as armed and dangerous transients implicated in serial killings" and some "recounted [the codefendant's] criminal history and alleged ties to the [w]hite supremacist Aryan Brotherhood." (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 44.)  Similarly, in *Famalaro*, we concluded that it was "reasonable to infer that the memories of any prospective jurors" who had been exposed to a few news reports containing inadmissible material or potentially prejudicial information "would have been dimmed by the passage of time." (*Famalaro*, *supra*, 52 Cal.4th at p. 22.)

Significantly, when an extended period of time passes between most of the publicity and the trial, the prejudicial impact of initial media coverage diminishes. (*Rountree*, *supra*, 56 Cal.4th at p. 838.) "It is . . . difficult to envision an eventual capital case which will not receive extensive media coverage, at least for a short period of time. If the early publicity attendant on a capital case alone suffices to raise a doubt as to the likelihood of a fair and impartial trial, a change of venue would perforce be required in every such case." (*Odle*, *supra*, 32 Cal.3d at p. 942.)  Even in cases with saturated media coverage, we have concluded that "the passage of more than a year from the time of the extensive media coverage served to attenuate any possible prejudice . . . ." (*Ramirez*, *supra*, 39 Cal.4th at p. 434.)  In *People v. Lewis* (2008) 43 Cal.4th 415, many articles used inflammatory terms, and some revealed inadmissible facts such as the defendant's prior incarceration, his gang affiliations, and his codefendant's confession, as well as prejudicial information concerning his status as a suspect in other offenses and his confessions to several charged murders.  In affirming the trial court's denial of the defendant's change of venue motion, we observed that "[m]ost of the coverage — and nearly all of

the potentially inflammatory coverage — occurred . . . nearly a year before jury selection occurred." (*Id.* at p. 449.) Likewise, in *Odle*, we held that the two-year gap between the period of extensive media coverage and the prospective trial date resolved any doubt concerning the likelihood that the defendant could receive a fair and impartial trial in the county where the crimes occurred. (*Odle*, *supra*, 32 Cal.3d at p. 943.) We explained that "[t]ime dims all memory and its passage serves to attenuate the likelihood that early extensive publicity will have any significant impact at the time of trial." (*Ibid.*; see also *Panah*, *supra*, 35 Cal.4th at p. 448 [any potential prejudice from media coverage was attenuated by yearlong gap between time when most articles had appeared and defendant's trial].)

Here, as in *Lewis* and *Odle*, most of the press coverage was attenuated. Defendant's trial began more than a year and a half after the initial pretrial publicity period had subsided. Approximately half of the articles submitted by defendant were published within the first month after the offense, and the vast majority of articles were published within the initial five months of the offense. Thereafter, coverage was sporadic. Of those that were published after the five-month mark, which was still one year before jurors were summoned, all but two articles contained factual updates about pretrial proceedings. Radio and television coverage of the case occurred on only five days in 1995 (mainly covering the days after the offense, the police search for defendant, and Deputy Trejo's memorial service) and once in July 1996 (covering the change of venue motion).

Defendant urges us to follow *Daniels v. Woodford* (9th Cir. 2005) 428 F.3d 1181, 1212, in which the United States Court of Appeals for the Ninth Circuit held that the nature and extent of the pretrial publicity warranted a change of venue. *Daniels* involved the shooting deaths of two police officers. (*Id.* at p. 1186.) But *Daniels* is distinguishable from defendant's case in at least one key respect —

23

there was extensive and nearly continuous publicity in *Daniels* just before the defendant's trial. (*Id.* at p. 1211.) Pervasive publicity "saturated the county" and amounted to a " 'huge' wave of public passion" during the period immediately preceding trial. (*Ibid.*) Here, by contrast, media coverage dissipated shortly after defendant's arrest and remained sporadic as trial approached. Thus, unlike in *Daniels*, the passage of 18 months between the initial publicity and defendant's trial "serves to attenuate the likelihood that early extensive publicity w[ould] have any significant impact at the time of trial" and "resolve[s] any doubt concerning the likelihood that [defendant] c[ould] receive a fair and impartial trial" in Sonoma County. (*Odle, supra*, 32 Cal.3d at p. 943.)

Defendant maintains that the high recognition and guilt rate presented in Dr. Bronson's survey compelled a change of venue. But even assuming that Bronson's survey produced accurate results, "the degree of exposure was not significantly higher than in other cases in which a change of venue was not required." (*Rountree, supra*, 56 Cal.4th at p. 838, citing *People v. Leonard* (2007) 40 Cal.4th 1370, 1396 (*Leonard*) [85 percent surveyed had heard of the case, and of those, 58 percent believed the defendant was probably or definitely guilty], *Ramirez, supra*, 39 Cal.4th at p. 433 [94.3 percent surveyed had heard of the case, and of those, 51.7 thought the defendant was responsible for the charged crimes], *Coffman and Marlow, supra*, 34 Cal.4th at p. 45 [71 percent surveyed had heard of the case, and of those, more than 80 percent thought the defendant was definitely or probably guilty]; see also *Suff, supra*, 58 Cal.4th at p. 1041 [73.2 percent surveyed had heard of the case, and of those, 66.9 percent thought the defendant was definitely or probably guilty]; *Harris, supra*, 57 Cal.4th at pp. 826–827 [72 percent surveyed had heard of the case, and of those, 66 percent thought the defendant was definitely or probably guilty]; *Famalaro, supra*, 52 Cal.4th at p. 19

[83 percent surveyed had heard of the case, and of those, 70 percent thought the defendant was definitely or probably guilty].) "Moreover, the survey did not ask whether the interviewees could set aside anything they had heard of the case and decide guilt or innocence based solely on the evidence presented at trial." (*Rountree*, at p. 839.)

With regard to his second change of venue motion, defendant contends the actual jury selection demonstrated that a fair trial could not be had in Sonoma County. He claims that the jury pool's written and oral answers to questions concerning pretrial publicity show that media coverage had prejudiced the pool against him. Defendant also emphasizes that approximately 83 percent of the potential jurors, and 77 percent of the seated jurors and alternates, recognized the case from the media.

It is true that jury selection showed that most prospective jurors had heard of defendant's case. However, " '[w]e must distinguish between mere familiarity with [the defendant] or his past and an actual prejudice against him.' " (*People v. Farley* (2009) 46 Cal.4th 1053, 1086, quoting *Murphy v. Florida* (1975) 421 U.S. 794, 800, fn. 4; see *Skilling v. United States*, *supra*, 561 U.S. at p. 381 ["Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*"].) "[T]he fact that prospective jurors may have been exposed to pretrial publicity about the case does not necessarily require a change of venue. [Citation.] ' "It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." ' " (*Panah*, *supra*, 35 Cal.4th at p. 448; see *People v. Harris* (1981) 28 Cal.3d 935, 949.)

Defendant asserts that the high percentage of seated jurors who recognized the case demonstrates that he did not receive a fair trial in Sonoma County. But we have upheld the denial of a change of venue in cases with a similar or higher percentage of seated jurors who had

some prior knowledge of the case. (See, e.g., *Harris*, *supra*, 57 Cal.4th at p. 830 [10 of 12 seated jurors]; *Rountree*, *supra*, 56 Cal.4th at p. 840 [eight of 12 seated jurors]; *Ramirez*, *supra*, 39 Cal.4th at p. 434 [11 of 12 seated jurors].) In *Prince*, we affirmed the denial of a venue change even though "a high percentage of the prospective jurors and 12 of the 13 jurors who actually served at trial . . . had been exposed to the publicity . . . ." (*Prince*, *supra*, 40 Cal.4th at p. 1215.) We based our decision on the jurors' responses to the juror questionnaire and voir dire, which "did not disclose any prejudgment or emotional bias." (*Ibid.*) We observed that the jurors mostly "displayed only a vague recollection of past news coverage," and found significant the jurors' assertions that "the publicity would not prevent them from serving as unbiased jurors." (*Ibid.*, citing *Panah*, *supra*, 35 Cal.4th at p. 448 [relying upon similar claims] & *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 46 [same].) Here too, the vast majority of seated jurors had only superficial knowledge of the case from pretrial publicity, and some had none at all.

Moreover, all of the jurors chosen to serve had confirmed that they had no preset views concerning the case that they would be unable to set aside based on what they had read or heard. (*People v. Peterson* (2020) 10 Cal.5th 409, 442.) Although Juror No. 3360 indicated in his questionnaire that, based on media reports, he thought "a violent criminal commit[ed] another violent crime," he also affirmed that he could set aside his personal opinion about defendant's guilt if selected to serve as a juror and explained that the information he had regarding the case came from the media, which, he offered, "has [been] proven wrong more times than not concerning important facts." During voir dire, he reiterated that although he had read a newspaper article that made it seem like defendant had committed the crime, he believed "the [news]paper more often than not gets proven wrong later on" and he viewed the media with skepticism.

Juror No. 3360 also affirmed that he would "absolutely" keep an open mind regarding the charges against defendant and assured the court that he would base his decision only on the evidence, not on what he might have learned from the media. The trial court found that although Juror No. 3360 said he had heard a lot about the case, his responses to questions in the jury questionnaire and during voir dire demonstrated that he had an open mind. It is sufficient that the trial court found that the actual jurors " 'had demonstrated an ability to set aside any preconceived impressions derived from the media.' " (*Rountree, supra,* 56 Cal.4th at p. 840; see also *Prince, supra,* 40 Cal.4th at p. 1216 [" 'The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow' "].)

In view of this record, we conclude that substantial evidence supports the trial court's assessment that the nature and the extent of media coverage in defendant's case does not weigh in favor of a venue change. We afford the court's judgment here particular weight because the judge sat in the county where the publicity was said to have had its effect, and could therefore " 'base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." ' " (*Rices, supra,* 4 Cal.5th at p. 74.)

### iii. Size of the community

"The size of the community is important because . . . a major crime is likely to be embedded in the public consciousness more deeply and for a longer time [in a small rural community] than in a populous *urban* area." (*People v. Coleman* (1989) 48 Cal.3d 112, 134 (*Coleman*), italics added; see *Martinez v. Superior Court, supra,* 29 Cal.3d at p. 581.) Although a lengthy passage of time between the crime and trial "may be an efficacious antidote to publicity in medium-size and large cities," the delay may be less effective in a small community. (*Maine, supra,* 68 Cal.2d at p. 387.) "The larger the local population,

the more likely it is that preconceptions about the case have not become imbedded in the public consciousness." (*People v. Balderas* (1985) 41 Cal.3d 144, 178 (*Balderas*).) However, even "a large city may . . . also become so hostile to a defendant as to make a fair trial unlikely." (*Maine*, at p. 387, fn. 13.) "In any event, population size alone is not determinative." (*Fain v. Superior Court* (1970) 2 Cal.3d 46, 52, fn. 1.)

At the time of defendant's initial motion for change of venue, the population of Sonoma County was 421,500 and ranked 16th of California's 58 counties in population size. In *Coleman*, decided seven years before defendant's trial commenced, we concluded that Sonoma County's size did not weigh in favor of a venue change. (*Coleman*, *supra*, 48 Cal.3d at p. 134 [Sonoma County, population approximately 300,000 in 1980].) "Though not one of the state's major population centers," we noted, "the county is substantially larger than most of the counties from which this court has ordered venue changes." (*Ibid.*) Indeed, we have upheld the denial of motions for change of venue in similar or smaller counties. (See, e.g., *People v. Vieira* (2005) 35 Cal.4th 264, 280–283 [Stanislaus County, population approximately 370,000]; *People v. Weaver* (2001) 26 Cal.4th 876, 905 [Kern County, population approximately 450,000]; *Balderas*, *supra*, 41 Cal.3d at pp. 178–179 ["Cases in which venue changes were granted or ordered on review have usually involved counties with much smaller populations" than approximately 400,000].) In finding that the size and nature of Sonoma County did not support of venue in this case, the trial court also determined that "this County cannot be categorized as rural. It has as many suburban areas as rural communities." Accordingly, this factor does not weigh in favor of a venue change.

### *iv. Defendant's status in the community*

In evaluating defendant's status within the community, courts consider "whether [he or she] was viewed by the press as an outsider, unknown in the community or associated with a group to which the community is likely to be hostile." (*Odle, supra,* 32 Cal.3d at p. 940.) Based on our review of the articles attached to defendant's first change of venue motion, defendant's claim that the press treated him as an "outsider" is unsupported. Moreover, although defendant was not from Sonoma County, as a white male he was not an outsider "in any ethnic, racial, or gender sense." (*Rountree, supra,* 56 Cal.4th at p. 839; see *Leonard, supra,* 40 Cal.4th at p. 1397; *McCurdy, supra,* 59 Cal.4th at p. 1079.) And, given Sonoma County's substantial population, the fact that defendant was not from that county is of less significance. In *Coleman,* the defendant was black, an ex-convict who had just been released from prison, and not from Sonoma County, where the case was tried. (*Coleman, supra,* 48 Cal.3d at p. 134.) We held that "[t]he lack of county residents personally acquainted with defendant, however, seems of little weight since the county is of such size that most of its inhabitants would probably not expect to be acquainted with more than a small proportion of their fellow citizens." (*Ibid.*)

Additionally, any disdain for defendant as a "career criminal," "recent parolee," or alleged member of the Aryan Brotherhood was not specific to Sonoma County. Here, " 'there was no evidence of *unusual local hostility* to such persons, such that a change of venue would likely produce a less biased panel.' " (*Panah, supra,* 35 Cal.4th at p. 449, italics added; see *Balderas, supra,* 41 Cal.3d at p. 179 [no evidence of "unusual local hostility" to Mexican-Americans or chronic drug abusers, or any other associations that might arouse hostility specific to local community]; see also *Corona v. Superior Court* (1972)

24 Cal.App.3d 872, 877.) We conclude that defendant's status in the community does not weigh in favor of a change of venue.

## v. *The victim's status in the community*

The community status of the victim generally focuses on "whether the victim had any prominence in the community *before* the crimes." (*McCurdy*, *supra*, 59 Cal.4th at p. 1079, italics added; see *Harris*, *supra*, 57 Cal.4th at p. 829 [prominence of the victim means "whether the victim was known to the public before the crime"].) Neither Deputy Trejo nor the Cooper/King family were known to the public before the offenses occurred. We have, however, considered the posthumous status of a slain police officer when the events and media coverage following the crimes made the officer a celebrity after he was killed. (*Odle*, *supra*, 32 Cal.3d at p. 942.) Numerous articles portrayed Deputy Trejo as a dedicated public servant and "fallen hero," and his memorial service was well attended and televised. Nevertheless, as we have already concluded, the media coverage tapered off several weeks after the deputy's killing and substantially predated defendant's trial. Thus, Deputy Trejo's posthumous prominence in the community may weigh somewhat in favor of a venue change, but it does not compel a venue change.

## vi. *Presence of political overtones*

As an additional factor to consider, defendant asserts that there were "political ramifications" stemming from his case that weighed in favor of a venue change. Defendant points to proposed legislation that would have required the Department of Corrections to physically transport persons released from PBSP to their parole destination, which was reintroduced after defendant's arrest. Following Deputy Trejo's death, legislators supporting this bill implied that the Governor's prior veto of their prison transport legislation resulted in the deputy's death. There is no evidence, however, to suggest that the

proposed legislation might have affected the proceedings. (See, e.g., *Maine, supra,* 68 Cal.2d at p. 387 [political overtone factor was present when we "harbor[ed] a gnawing fear" that the judgeship campaign competition between the district attorney and defense counsel "might inadvertently intrude during the course of a proceeding in which they are also trial adversaries"].) We agree with the trial court that there were no political overtones present in this case to warrant a change of venue.

### *vii. Summary*

Even assuming the nature and gravity of the offense and the status of the victim somewhat favored a change of venue, the totality of the factors did not. Reviewing the legal question de novo based on the factors above, we conclude defendant has not shown a reasonable likelihood that a fair trial could not be had in Sonoma County at the time of his venue change motions. (See, e.g., *People v. Duong* (2020) 10 Cal.5th 36, 50 [affirming denial of change of venue when only the nature and gravity of the offense weighed in favor of a venue change]; *McCurdy, supra,* 59 Cal.4th at p. 1079 ["[A]lthough some of the factors may have favored a changed venue, the totality of circumstances did not require one"].)

### 2. *Excusal of prospective juror based on death penalty views*

Defendant claims the trial court committed reversible error when it granted the prosecution's challenge for cause of Prospective Juror No. 3727 based on her views on the death penalty. We conclude the record fairly supports the excusal and uphold the trial court's ruling.

### a. *Background*

Prospective Juror No. 3727 provided conflicting answers in her questionnaire and during voir dire concerning whether she would be

able to consider the death penalty as punishment. In her jury questionnaire, she described her view on the death penalty as "moderately against" and expressed the view that "the death penalty does nothing to deter murder, and may be more expensive to the community in the long run, due to appeals and court costs." She indicated that there were crimes in which her "knee-jerk reaction is to give the death penalty," but believed it "should be used sparingly in the most heinous cases, considering the remorse of the criminal and considering his/her background." She described her philosophical view as "[m]oderately against" the death penalty. She stated that she did not know if she would be able to set aside her personal beliefs about the death penalty and apply the law, rules, and instructions as given to her by the court. She elaborated: "I would certainly try — but I am subject to emotions like anyone else, and I do rely on intuition to guide me through much of life. When looking around this room I'm thinking, do we really have the right to decide another person's fate?" She also explained that she opposed the death penalty because of its high cost, the possibility that the jury might be wrong, and the fact that people of color are disproportionally sentenced to death.

During sequestered *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80–81), the trial court explained to Prospective Juror No. 3727 that she would have to weigh the factors that supported death against those that supported a life sentence, and asked whether she could vote for death if she was convinced that the factors in favor of death substantially outweighed the factors in favor of life without the possibility of parole. Prospective Juror No. 3727 answered that it would depend on the factors she had to consider and whether she agreed with all the factors, but ultimately responded that she could decide the case in accordance with the court's instructions. Yet when the court asked Prospective Juror No. 3727 whether she could impose the death penalty if warranted after hearing all the

evidence, instructions, arguments by the attorneys and hearing the view of the other jurors, she replied, "I would have a hard time doing that." She reiterated that her "knee-jerk reaction is to say, no, it would be very hard to vote for the death penalty." When the court reminded her that in order to vote for death she would have to be convinced that the factors in favor of death substantially outweighed those in favor of life without the possibility of parole, and inquired again whether she could vote to impose the death penalty under those circumstances, Prospective No. Juror 3727 responded, "No, I don't think so." She stated that her belief against the death penalty stemmed from her basic philosophy of life she held for the past 10 years, and explained that the crime would have to be extremely severe for her to vote for death, providing the example of somebody who had "repeatedly committed crimes . . . repeatedly murdered people or a rapist who was a repeated rapist, or something like that." She stated that she was "85 or 90 percent" unable to sentence anyone to death and "would always consider life without parole as better, a better option." She expressed that she did not want to be responsible for deciding death, because doing so would not be good for her mental health. She repeated that it would be very difficult for her to impose the death penalty, and drew a distinction between being personally involved in the decision making, on the one hand, and others who might make the sentencing decision. At the close of Prospective Juror No. 3727's voir dire, when asked by the court a third time if she could vote in favor of death, she replied, "It would be a possibility. So I guess that says yes. I mean, it would be a consideration. It would be a possibility."

The prosecution challenged Prospective Juror No. 3727 for cause based on her asserted inability to properly consider and weigh whether to impose the death penalty. The court ultimately concluded that Prospective Juror No. 3727 was substantially impaired in this

respect, and dismissed her. After reviewing again all of her answers, the court stated it did not believe Prospective Juror No. 3727 was capable of fulfilling her duties as a juror. The court emphasized that the juror never "unequivocally stated that she could consider the death penalty as a reasonable possibility."

### b. Discussion

"Under state and federal constitutional principles, a criminal defendant has the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) With regard to jury selection in a capital case, decisions by this court and the United States Supreme Court have made clear that prospective jurors' personal opposition to the death penalty is not a sufficient basis on which to remove them from jury service in a capital case, ' "so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 646 (*Schultz*).)

Still, excusal for cause is permissible when the prospective juror's beliefs regarding the death penalty "would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424, quoting *Adams v. Texas* (1980) 448 U.S. 38, 45 (*Adams*).) "While a prospective juror may not be excused for cause based on 'general objections' or 'conscientious or religious scruples' against the death penalty (*Witherspoon*[ *v. Illinois* (1968)] 391 U.S. [510,] 522), excusal is proper when a prospective juror cannot 'consider and decide the facts impartially and conscientiously apply the law as charged by the court' (*Adams, supra*, 448 U.S. at p. 45)." (*Schultz, supra*, 10 Cal.5th at p. 649.)

On review, we consider whether the record "fairly supports" the trial court's determination that a prospective juror's views on the

death penalty would have prevented or substantially impaired her performance as a juror. (*People v. Thomas* (2011) 52 Cal.4th 336, 357.) " ' "Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for 'appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " ' " (*Id.* at p. 358.) " 'When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1062 (*Wall*); see also *People v. Wilson* (2008) 44 Cal.4th 758, 779.)

Prospective Juror No. 3727's responses regarding her ability to vote for death indicated that she was not capable of fulfilling her duties as a juror. Although she described a death vote as a "possibility" following clarification from the court about her discretion, she never stated that she could actually impose the death penalty when warranted, instead reiterating that it would be very difficult for her to do so. In her questionnaire responses and during *Hovey* questioning, she stated that she did not know if she would be able to set aside her personal beliefs about the death penalty and apply the law, rules, and instructions as given to her by the court, and later conveyed that she did not think she could do so. Given Prospective Juror No. 3727's repeated equivocation regarding her ability to "conscientiously apply the law as charged by the court" (*Adams*, *supra*, 448 U.S. at p. 45), we conclude that the record fairly supports the trial court's excusal of the juror for cause. (See *Wall*, *supra*, 3 Cal.5th at p. 1063 [upholding excusal of a prospective juror who repeatedly expressed uncertainty regarding her ability to impose a

death sentence]; *People v. Duenas* (2012) 55 Cal.4th 1, 12 (*Duenas*) ["Comments that a prospective juror would have a 'hard time' or find it 'very difficult' to vote for death reflect 'a degree of equivocation' that, considered 'with the juror's . . . demeanor, can justify a trial court's conclusion . . . that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror . . . .' " ' "]; *People v. Martinez* (2009) 47 Cal.4th 399, 431–432 [upholding dismissal of juror even though some of her responses reflected a willingness to follow the law and the court's instructions]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1114–1115 [same].)

### 3. *Denial of defendant's motion to dismiss two counts*

Defendant contends the trial court erred when it denied his section 995 motion to dismiss the counts of conspiracy to commit robbery and attempted robbery of Marian Wilson on the ground that there was insufficient evidence to support those counts. He maintains that, as a consequence, the prosecutor was allowed to introduce prejudicial evidence of defendant's prior armed robberies, which portrayed him as a person of bad character. And, he asserts, this predisposed the jury to reject his testimony that he accidentally shot Deputy Trejo. We conclude the trial court properly denied the motion.

### a. *Background*

As pertinent here, the complaint charged defendant and Moore with conspiracy to commit robbery of Wilson, attempted robbery of Wilson, and attempted robbery of patrons and employees of the R&S Bar. It also alleged in the fourth special circumstance that the murder of Deputy Trejo took place during an attempted robbery of the R&S Bar. In connection with the attempted robbery counts, the prosecution sought to admit evidence of defendant's prior armed robberies under Evidence Code section 1101, subdivision (b) as evidence of intent and common plan or scheme.

At the preliminary hearing, the prosecution presented the following evidence in support of the conspiracy to commit robbery and attempted robbery of Wilson: Wilson and Sung Won Kim owned Sushi Hana, a restaurant located in Sebastopol. On March 29, 1995, at approximately 9:00 p.m., Wilson and Kim closed Sushi Hana to customers but remained inside to clean and shut the restaurant. Wilson went grocery shopping about an hour later. As she was returning to Sushi Hana, Wilson observed a green pickup truck parked around the corner from the restaurant with two people sitting inside. Wilson noticed the unusual rack on the back of the truck. She parked her vehicle across the street from Sushi Hana and went inside to retrieve the mail and day's receipts. When Wilson left the restaurant and began to cross the street, she noticed that the same green pickup truck was now parked in front of her vehicle with the passenger door open. As Wilson got into her vehicle, she saw both individuals exit the pickup truck and walk toward her. Wilson quickly drove away, circled the block, and saw the pickup truck leaving. Wilson deposited the mail and returned to Sushi Hana. Although Wilson did not see either individual holding a weapon, the prosecution presented evidence that defendant was in possession of a sawed-off shotgun that evening. Wilson identified Moore as the woman in the pickup truck.

Following the preliminary hearing, the magistrate judge found there was insufficient evidence to hold defendant and Moore on the charges of conspiracy to commit robbery of Wilson, the attempted robberies of Wilson and the R&S Bar patrons, and the attempted-robbery-murder special circumstance. The magistrate judge also denied the prosecution's motion to admit evidence of defendant's prior armed robberies, finding the prior crimes and charged offenses were not sufficiently similar.

Subsequently, the prosecution filed an information recharging defendant with, among other offenses, the same counts that the magistrate judge had dismissed based on insufficient evidence. (§ 739.) The trial court granted defendant's motion to dismiss the attempted robbery of R&S Bar patrons and attempted-robbery-murder special-circumstance allegation, but denied the motion as to conspiracy to commit robbery and attempted robbery of Wilson. It found that the prosecution had presented sufficient evidence at the preliminary hearing to charge defendant with conspiracy and attempted robbery of Wilson. The court also admitted evidence establishing four of the prior robberies under Evidence Code section 1101, subdivision (b), finding they bore sufficient similarities to the charged offenses of conspiracy to commit robbery and attempted robbery of Wilson.

After the close of the prosecution's case, the trial court granted the defense's motion for judgment of acquittal on the attempted robbery charge based on insufficient evidence. The jury hung on the conspiracy charge and the court declared a mistrial on that count.

### b. Discussion

"When the defendant challenges the district attorney's election to include charges for which defendant was not held to answer at the preliminary hearing, '[t]he character of judicial review under section 739 depends on whether the magistrate has exercised his power to render findings of fact. If he has made findings, those findings are conclusive if supported by substantial evidence. [Citations.] If he has not rendered findings, however, the reviewing court cannot assume that he has resolved factual disputes or passed upon the credibility of witnesses. A dismissal unsupported by findings therefore receives the independent scrutiny appropriate for review of questions of law. The cases arising under section 739 explain this distinction.' " (*People v. Bautista* (2014) 223 Cal.App.4th 1096, 1101 (*Bautista*), quoting *People*

*v. Slaughter* (1984) 35 Cal.3d 629, 638; see also *Pizano v. Superior Court of Tulare County* (1978) 21 Cal.3d 128, 133 (*Pizano*) ["[A]n offense not named in the commitment order may not be added to the information if the magistrate made *factual findings* which are fatal to the asserted conclusion that the offense was committed. . . . When, however, the magistrate either expressly or impliedly accepts the evidence and simply reaches the ultimate *legal* conclusion that it does not provide probable cause to believe the offense was committed, such conclusion is open to challenge by adding the offense to the information."].)

Here, the preliminary hearing transcript reflects that the magistrate judge did not make factual findings or credibility determinations, but simply concluded that the People did not put forth sufficient evidence to support the charges. Accordingly, we independently determine the sufficiency of the record at the preliminary hearing to support the charges related to Wilson. (*Pizano*, *supra*, 21 Cal.3d at pp. 133–134; *Bautista*, *supra*, 223 Cal.App.4th at p. 1103.)

To establish probable cause sufficient to overcome a section 995 motion, "the People must make some showing as to the existence of each element of the charged offense." (*Thompson v. Superior Court* (2001) 91 Cal.App.4th 144, 148 (*Thompson*).) "Evidence that will justify a prosecution need not be sufficient to support a conviction." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 (*Rideout*)); *People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 (*Jurado*) ["[A]n indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged"].) "We will not set aside an information 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654, quoting *People v. Hall* (1971)

3 Cal.3d 992, 996.) With this low evidentiary bar in mind, we conclude the evidence presented to the magistrate provided probable cause to believe the offenses against Wilson were committed.

> i. *Evidence of conspiracy to commit robbery of Wilson*

"Pursuant to section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime. A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, fn. omitted, quoting § 184.)

"Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the subject of the conspiracy. [Citation.] 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] the agreement to commit a crime,' and 'thus reaches further back into preparatory conduct than attempt . . . .' " (*People v. Swain* (1996) 12 Cal.4th 593, 599–600.) The agreement to commit a crime plus the commission of an overt act — " ' " [a]n outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime" ' " — completes the crime of conspiracy. (*People v. Johnson* (2013) 57 Cal.4th 250, 259.)

The information charged defendant with conspiracy to commit robbery, defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

Under the standard of review, we conclude the prosecution made a sufficient showing to try defendant for conspiracy to commit robbery. The existence of defendant and Moore's specific intent to agree or conspire to commit robbery and to commit robbery was adequately established by the following evidence (and from the reasonable inferences that could be drawn from it): (1) on March 29, 1995, defendant and Moore continued driving around the Santa Rosa/Sebastopol area, despite defendant's imminent parole reporting date in San Diego; (2) defendant and Moore parked down the street from Sushi Hana after it had closed and, a few minutes later, positioned themselves directly across the street from the restaurant and in front of Wilson's truck; (3) as Wilson walked out of Sushi Hana and approached her vehicle, Moore and defendant exited Moore's truck at the same time and walked toward Wilson; (4) when Wilson drove away, both defendant and Moore returned to the truck and drove off; (5) a watch cap, binoculars, and several latex gloves were found in Moore's truck; and (6) police located additional latex gloves and a watch cap with the top cut open in a field near the Cooper/King residence. Similarly, the existence of overt acts committed in furtherance of the conspiracy to commit robbery was established by the following evidence: (1) defendant and Moore were armed with a loaded short-barreled shotgun; (2) the pair obtained a street map of Santa Rosa, marking several locations, which they may have intended to rob; (3) they possessed watch caps and latex gloves, apparently to avoid identification; and (4) they surveilled the area of the Sushi Hana restaurant. Drawing every legitimate inference from the evidence in favor of the information, as we must, we conclude that the prosecution presented some evidence to support the count of conspiracy and therefore reinstatement of this charge was proper. (See *Rideout*, *supra*, 67 Cal.2d at p. 474 ["[I]f there is some evidence to support the information, the [reviewing] court will not inquire into its sufficiency.

[Citations.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information."].)

### ii. Evidence of attempted robbery of Wilson

"Attempted robbery requires the 'specific intent to commit robbery and . . . a direct but ineffectual act toward the commission of the crime.' " (*People v. Sánchez* (2016) 63 Cal.4th 411, 470.) The act requires more than mere preparation, but it need not be the last step toward commission of the crime. (*Ibid.*) In *Sánchez*, we held that evidence showing five armed men arriving at a coffee shop, positioning a car to make a quick getaway, and actually entering the coffee shop was enough for a jury to find the necessary act beyond mere preparation. (*Ibid.*) We also cited with approval *People v. Dillon* (1983) 34 Cal.3d 441 and *People v. Bonner* (2000) 80 Cal.App.4th 759. (*Sánchez*, at p. 470.) In *Dillon*, this court found sufficient evidence of attempted robbery when the would-be robbers armed and disguised themselves, approached but did not enter the targeted marijuana field, passing "no trespassing" signs on the way, and then watched for their opportunity. (*Dillon*, at p. 456.) Likewise, in *Bonner*, the Court of Appeal concluded there was sufficient evidence to convict the defendant of attempted robbery when the defendant made detailed preparations for the robbery, went armed to the scene, placed a mask over his face, and waited in hiding moments before the victim's approach, even though he was never in close proximity to the victim and made no demand for money. (*Bonner*, at pp. 763, 764, fn. 3.)

Given that the evidence presented in *Sánchez*, *Dillon*, and *Bonner* was held to be sufficient to support a *conviction* of armed robbery, which requires the prosecution prove each element beyond a reasonable doubt, we conclude that the evidence presented in this case was sufficient to support a *prosecution* of the attempted robbery count, which merely requires "some showing as to the existence of each element of the charged offense." (*Thompson*, *supra*, 91 Cal.App.4th at

p. 148; see also *Rideout, supra,* 67 Cal.2d at p. 474.) Defendant and Moore armed themselves with a loaded short-barreled shotgun, obtained a street map of Santa Rosa and apparently marked potential locations of robbery victims on the map, and obtained watch caps and gloves, again apparently to avoid identification. They next surveilled Sushi Hana after closing hours, first parking down the street from the restaurant and then moving to a location directly across the street where they could see inside of the restaurant through its large front window. They waited for Wilson to leave the restaurant with her briefcase in hand before exiting Moore's truck and walking toward Wilson. Taken together, and drawing all legitimate inferences in favor of the information (*Rideout,* at p. 474), we conclude the prosecution established probable cause sufficient to overcome defendant's section 995 motion on this count. Because the attempted robbery allegation should have been set aside only if there was "a total absence of evidence" to support a necessary element of that offense (*Jurado, supra,* 4 Cal.App.4th at p. 1226), and the prosecution here presented at least some evidence to support each element, the trial court properly reinstated the attempted robbery allegation.

### 4. Admission of evidence of other crimes

Defendant claims the trial court prejudicially erred in allowing the introduction of his past armed robberies. He contends the previous incidents were not sufficiently similar to the charged offenses to prove intent or a common scheme and were used for the impermissible purpose of showing his propensity to commit the charged crimes and portraying him as a person of bad character. We conclude this claim lacks merit.

#### a. Background

As discussed in part II.A.3., *ante,* based on the evidence presented at the preliminary hearing, the magistrate judge denied the

prosecution's motion to admit defendant's prior crime evidence on the grounds that the prior robberies were not sufficiently similar to the charged attempted robbery. Yet after the prosecution recharged defendant in the information and filed a motion to admit defendant's prior acts under Evidence Code section 1101, subdivision (b), the trial court allowed the prosecution to introduce evidence of four armed robberies of bars and restaurants committed by defendant and an accomplice in December 1981 in San Diego County.

The evidence introduced at trial concerning defendant's prior crimes can be summarized as follows: On December 10, 1981, defendant and an accomplice entered the Bull Pen Bar shortly after the bar closed. Defendant confronted the bartender and another individual with a sawed-off shotgun, ordered the bartender to give him money from the register, and commanded them to lie on the floor until the pair left. On December 16, 1981, defendant and an accomplice robbed the Bollweevil Restaurant shortly after closing. Defendant approached the night supervisor, pointed a gun at her head, and ordered her to retrieve cash from the office cash box and register. On December 23, 1981, defendant and an accomplice robbed a Pizza Hut soon after the restaurant had closed for the evening. Defendant, armed with a shotgun, confronted the assistant manager, and ordered her to give him money from the safe and cash register. The accomplice pointed a handgun at another employee. On December 29, 1981, defendant and an accomplice robbed a different Pizza Hut just after the restaurant closed. Defendant approached the assistant manager and displayed a sawed-off shotgun. He ordered her to open the safe and proceeded to take money from it. The accomplice then ordered the assistant manager to open the cash register and give him money from it.

Stephen Jarrett testified that he committed the string of robberies with defendant. According to Jarrett, the duo targeted

restaurants and bars they were familiar with and knew had late business hours and accessible cash. Jarrett attested that they looked for businesses that were isolated and had easy access to roads. The pair would wait for the business to close before robbing it so there would be no customers inside and less interference.

### b. Discussion

"The rules governing the admissibility of evidence under Evidence Code section 1101[, subdivision ](b) are well settled." (*People v. Cage* (2015) 62 Cal.4th 256, 273.) " ' "[O]ther crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." ' [Citation.] 'In this inquiry, the degree of similarity of criminal acts is often a key factor, and "there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: 'The least degree of similarity . . . is required in order to prove intent . . . .' . . . By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." ' " (*People v. Erskine* (2019) 7 Cal.5th 279, 295 (*Erskine*).)

Evidence is admissible to prove intent if there is " 'sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827 (*Daveggio and Michaud*).) In order to establish the existence of a common design or plan, " 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' " (*Id*. at p. 828.)

We review the trial court's ruling on the admissibility of other crimes evidence for abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) We will not disturb its ruling on appeal absent a showing that it exercised its discretion in an arbitrary manner resulting in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.)

We conclude that the four prior robberies were, at a minimum, admissible under Evidence Code section 1101, subdivision (b) as evidence of defendant's intent regarding attempted robbery. The prior robberies shared several similarities with the instant offense, including defendant and an accomplice surveilling a restaurant or bar located in an isolated area with easy road access, targeting restaurants or bars late at night after they were closed to customers but still had employees inside, brandishing or possessing a firearm, and using a vehicle in facilitating the robberies. Although there were some differences between the San Diego robberies and the events outside of Sushi Hana, such as defendant and Moore approaching Wilson outside of the restaurant and without displaying weapons, the similarities between the prior and charged offenses "provided a sufficient basis for the jury to conclude that defendant[] acted with the same criminal intent or motive, rather than by ' "accident or inadvertence or self-defense or good faith or other innocent mental state." ' " (*Daveggio and Michaud, supra*, 4 Cal.5th at p. 827.)

We also conclude that the trial court acted within its discretion in finding the evidence more probative than prejudicial under Evidence Code section 352. None of the prior crime evidence was particularly inflammatory or likely to invoke an emotional bias against defendant. (*People v. Foster* (2010) 50 Cal.4th 1301, 1331; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

### 5. *Admission of defendant's refusal to participate in lineup*

Defendant contends the trial court erred in admitting evidence that he refused to participate in a lineup. He asserts that any probative value was outweighed by its prejudicial effect, and the evidence denied him due process and a fair trial. Defendant also claims it is reasonably probable the verdict would have been more favorable to him absent the alleged error. We conclude that the evidence was properly admitted.

#### a. *Background*

On April 1, 1995, two days after defendant's arrest, Sonoma County Sheriff's Department Correctional Officer Meredith Helton approached defendant in his jail cell and read a prewritten statement asking if he would participate in a live lineup. Initially, defendant asked to speak with an attorney before answering the question. Later that evening, after Officer Helton informed defendant that a representative from the public defender's office would be present and willing to answer any questions, defendant stated that he did not wish to participate in a lineup.

The following day, Santa Rosa Police Sergeant Thomas Schwedhelm asked defendant if he would participate in the lineup process. After defendant shook his head, Sergeant Schwedhelm informed defendant that his failure to cooperate in the process would indicate a consciousness of guilt on his part and could be admitted in a court of law.

On April 11, 1995, Sergeant Schwedhelm again asked defendant and his counsel if he would be willing to participate in a lineup, to which counsel responded, "no." Sergeant Schwedhelm then contacted defendant and reminded him that his refusal to cooperate in a live lineup could be used against him in court to show consciousness of guilt. Defendant confirmed that he did not wish to participate.

### b. Analysis

As the officer advised, evidence of a defendant's refusal to participate in a lineup may be used against him or her at trial. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1222.) "A defendant's refusal to participate in a lineup is admissible evidence supporting an inference of consciousness of guilt." (*People v. Watkins* (2012) 55 Cal.4th 999, 1027.)

Defendant argues that because his identity was not an issue at trial, evidence of his refusal to participate in a lineup was irrelevant and unduly prejudicial. He is incorrect. At the time he was asked to participate in a lineup, identity was an issue, as were all elements of the crimes, and the prosecutor was required to prepare to prove them beyond a reasonable doubt. The prosecutor could not and should not rely solely on defendant's statements being admitted into evidence. The defense could have sought to exclude the statements and prevailed, or the statements could be undermined. Given that there were multiple witnesses to the shooting, and notwithstanding what the ongoing investigation revealed at that time, the prosecutor was entitled to develop the case.

Furthermore, "[i]nstructions on consciousness of guilt are proper not only when identity is an issue, but also when 'the accused admits some or all of the charged conduct, merely disputing its criminal implications.' " (*People v. Thornton* (2007) 41 Cal.4th 391, 438, quoting *People v. Turner* (1990) 50 Cal.3d 668, 694, fn. 10.) At trial, defendant admitted shooting Deputy Trejo but maintained that it was an accident and pleaded not guilty to all charges. Several witnesses testified that the shooting was intentional, contradicting the defense version that it was an accident. These witnesses' identification of defendant was a critical part of the prosecution's case. Thus, "the jury had before it the issue of guilt on all charges." (*People v. Breaux* (1991) 1 Cal.4th 281, 304.) Further, under the

circumstances, the evidence was more probative than prejudicial under Evidence Code section 352.

### 6. *Admission of photographs*

Defendant contends the trial court abused its discretion by permitting the introduction of 18 photographs of Deputy Trejo's body taken at the scene of his death and during the autopsy. He claims the photographs were more prejudicial than probative under Evidence Code section 352, and their admission violated his state and federal constitutional rights. We conclude there was no error.

The prosecution initially sought to introduce 25 photographs of Deputy Trejo's body at the crime scene and during autopsy. Defendant moved in limine to exclude the photos, arguing that they were irrelevant and inflammatory. After reviewing the evidence, the trial court admitted 18 photographs, excluding the rest as overly gruesome or cumulative.

The photographs fell into three categories, depicting: the deputy's body facedown at the crime scene; the deputy's body after he was turned on his back at the crime scene; and images from the autopsy. The court admitted 10 photographs of Deputy Trejo's body facedown at the crime scene based on the prosecution's argument that they were needed to show the deputy's position in the R&S Bar parking lot, the position of his hands relative to his body, and the placement of blood, tissue fragments, and debris on his body. It excluded three crime scene photographs as cumulative and overly gruesome. The court admitted three photographs of the deputy's body at the crime scene after he was turned on his back as relevant to Dr. Jindrich's testimony about blood and brain matter on Deputy Trejo, but asked the prosecution to crop two of the photographs to lessen their gruesomeness. It admitted five photographs of Deputy Trejo's autopsy, which depicted closeup images of the deputy's facial

wounds, as relevant to Dr. Jindrich's testimony regarding the position of Deputy Trejo's body in relation to the shot fired and the extent of the injury as well as criminologist Waller's testimony regarding the distance from which Deputy Trejo was shot, but requested that one of the photographs be cropped to lessen its gruesome effect. The court excluded four of the autopsy photographs as overly gruesome.

"This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative [citation]. A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." (*People v. Gurule* (2002) 28 Cal.4th 557, 624.) "In a prosecution for murder, photographs of the murder victim and the crime scene are always relevant to prove how the charged crime occurred . . . ." *People v. Pollock* (2004) 32 Cal.4th 1153, 1170 (*Pollock*).) The prosecution is not obliged to prove its case solely from the testimony of live witnesses; "the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." (*Gurule*, at p. 624.)

" 'To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282.) Having examined all

of the photographs, we find that the trial court did not abuse its discretion.

The photographs of Deputy Trejo's facial wounds, his body position, the position of his hands relative to his body, and the position of blood and brain matter supported the prosecution's theory that defendant intentionally shot the deputy when he was on his knees, and were inconsistent with defendant's claim that the shooting was accidental and that Deputy Trejo was prone on the ground when the gun discharged. They were relevant to corroborate and illustrate the testimony of several witnesses who saw the crime occur, the testimony of the investigating officers about the condition in which they found the crime scene, and the testimony of the forensic pathologist about the position of the deputy's body when he was killed. Thus, each of these photographs was probative as to significant issues.

Moreover, even though some of the photographs were gruesome, none was unduly so. Photographs of victims in murder cases are always disturbing. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1272.) " 'The photographs at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes.' " (*Ibid.*) Moreover, "[a]utopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes." (*People v. Howard* (2010) 51 Cal.4th 15, 33.) Additionally, given the witnesses' detailed description of the circumstances of the crime scene and the deputy's condition, the photographs corroborating such testimony are not so gruesome or inflammatory as to have impermissibly swayed the jury. (*People v. Smithey* (1999) 20 Cal.4th 936, 974.) Therefore, the trial court did not abuse its discretion in admitting the photographs in question.

### 7. *Claims of instructional error*

#### a. *Requested accident instruction relating to premeditated murder*

Defendant requested a pinpoint instruction on his accident defense as it applied to the prosecution's theory of premeditated murder. CALJIC No. 4.45, the standard instruction concerning accident, provides that the defense applies when "circumstances . . . show neither criminal intent nor purpose, nor [criminal] negligence . . . ." Defense counsel acknowledged that this standard version of CALJIC No. 4.45 would be inappropriate in this case because their theory was not that there was no criminal intent or purpose, but rather that the accident negated premeditation and deliberation for first degree murder. Counsel instead proposed a modified version of CALJIC No. 4.45, which would have instructed the jury as follows: "In considering the prosecution theory of first degree premeditated murder, if there is a reasonable doubt of whether or not the killing of Deputy Trejo was an accident, you must resolve the doubt in favor of the defendant and bring in a verdict of no more than second degree murder."

The prosecution objected to the proposed modified instruction as problematic because, it observed, defendant could still be found guilty of first degree murder under the felony murder theory even if the jury found the shooting was accidental. The prosecution maintained that the proposed instruction failed to clarify that accident was not a defense to felony murder — its alternate theory of first degree murder. The prosecution argued that even though the proposed instruction began with the limiting phrase regarding first degree murder, the jury was nevertheless being instructed that it must return a verdict of no more than second degree murder if it found the killing of Deputy Trejo was an accident, an improper instruction in light of the alternative felony murder theory.

The trial court agreed that the proposed instruction would potentially confuse the jury and was an incorrect statement of the law. The court reasoned that if the jury adopted the felony murder theory, then "it is not true that if there's a reasonable doubt as to whether or not the killing of Deputy Trejo was an accident, they must resolve the doubt in his favor and bring in a verdict of no more than second degree murder. That is a completely incorrect statement." It offered defense counsel the choice of either giving the standard CALJIC No. 4.45 instruction without modification or not giving any accident instruction related to first degree murder. Defense counsel confirmed that they did not want the standard instruction to be given because, in their view, it did not apply to defendant's case.

Pinpoint instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) We are "mindful of the general rule that a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).) We review de novo whether instructions correctly state the law. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1089, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Defendant maintains the trial court erred in failing to instruct the jury that accident should be considered a defense to premeditated murder. But as the prosecution and trial court explained, accident is not a defense to felony murder, and the proposed instruction risked confusing the jury by not making this distinction clear. In that vein, to the extent the proposed instruction purported to limit the jury to

returning a verdict of no more than second degree murder if it found the killing of Deputy Trejo was accidental, it also constituted an incorrect statement of law and the trial court properly refused to give it. (See *Moon*, *supra*, 37 Cal.4th at p. 31.)

Furthermore, the point of the requested instruction was readily apparent to the jury from the remaining instructions. (See *People v. Bolden* (2002) 29 Cal.4th 515, 558–559 (*Bolden*) ["An instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. Accordingly, a trial court is required to give a requested instruction relating to the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions."].) The trial court properly instructed the jury on the dual theories of first degree murder, stating: "There are two theories upon which a conviction of first degree murder can be based. The first theory is the willful, premeditated, deliberate killing of a human being with malice aforethought. The second theory is the killing of that human being during the commission of a robbery. If you find that the evidence proves either one or both of these theories beyond a reasonable doubt, a verdict of guilty for first degree murder is appropriate. [¶] It is not necessary for jurors to agree upon which theory of first degree murder they based a guilty verdict."

The court also defined the terms "willful, deliberate, and premeditated," making clear that an accidental killing would not satisfy this theory of first degree murder. It further informed the jury that an unintentional or accidental killing that occurs during the commission of a robbery would satisfy the felony murder theory of first degree murder if the perpetrator intended to commit the robbery. The

court also informed the jury that if it was not satisfied beyond a reasonable doubt that defendant was guilty of the crime of first degree murder as charged in count one, it could convict him of any lesser crime proved beyond a reasonable doubt. "Here, the jury received accurate and complete instructions" concerning the specific intent required for the premeditated first degree murder theory, and "nothing in the particular circumstances of this case suggested a need for additional clarification." (*Bolden, supra,* 29 Cal.4th at p. 559.) Accordingly, and because the proposed instruction was both misleading and incorrect on the law, we conclude "[t]he trial court did not error in refusing to give this requested pinpoint instruction." (*Ibid.*)

### b. *Requested accident instruction relating to robbery-murder special circumstance*

Defendant also requested a pinpoint instruction regarding accident as a defense to the robbery-murder special circumstance. He proposed adding language to the robbery-murder special-circumstance instruction to make clear that the shooting of Deputy Trejo must be committed "in order to advance an independent felonious purpose," that "[a]n act committed by accident is not committed in order to advance an independent felonious purpose," and that if the jury "ha[s] a reasonable doubt whether the act resulting in the victim's death was committed by accident, [it] must give the defendant the benefit of the doubt and find the special circumstance untrue." The trial court declined to give the pinpoint instruction, finding that it constituted an inaccurate statement of the law.

The trial court gave CALJIC No. 8.81.17, the standard robbery-murder special-circumstance instruction, which, as given, instructed the jury as follows: "To find the special circumstance referred to in these instructions as murder in the commission of robbery is true, it must be proved (1) the murder was committed while the defendant

was engaged in or was an accomplice in the commission of a robbery of Frank Trejo, and (2) the murder was committed in order to carry out or advance the commission of the crime of robbery of Frank Trejo or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder. However, the special circumstance referred to in these instructions is still proven if the defendant had the separate specific intent to commit the crime of robbery, even if he also had the specific intent to kill. Concurrent intent to kill and to commit an independent felony will support a felony murder special circumstance."

Defendant maintains that a robbery-murder special circumstance requires a finding that the killing was done to carry out or advance a robbery, and if the jurors accepted defendant's testimony that the shooting was accidental, there was no logical basis to conclude that the shooting was committed for any purpose at all. In other words, defendant contends the robbery-murder special circumstance does not apply to an accidental killing committed during the perpetration of a robbery.

Even assuming the trial court should have given defendant's requested instruction, we conclude that any error was harmless under the standard articulated in either *Chapman v. California* (1967) 386 U.S. 18, 36 (error is prejudicial unless it appears beyond a reasonable doubt that the error did not contribute to the verdict) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (error is prejudicial if it is reasonably probable the defendant would have obtained a more favorable result absent the error).

Harmless error analysis is appropriate when, in the circumstances, it can be said that assuming instructional error, " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given

instructions.' " (See *People v. Kobrin* (1995) 11 Cal.4th 416, 428, fn. 8.) Here, the jury found true that defendant intentionally killed Deputy Trejo while he was engaged in the performance of his duties (§ 190.2, subd. (a)(7) ["[t]he victim was a peace officer . . . who, while engaged in the course of the performance of his or her duties, was intentionally killed . . . ."]), and that he killed the deputy for the purpose of avoiding arrest (§ 190.2, subd. (a)(5) ["[t]he murder was committed for the purpose of avoiding or preventing a lawful arrest . . . ."]).  These explicit findings demonstrate that the jury necessarily rejected defendant's argument that he accidentally shot the deputy.

Moreover, defendant does not challenge the sufficiency of evidence sustaining the special circumstances of the intentional murder of a peace officer or murder for the purpose of avoiding a lawful arrest.  The record contains ample evidence supporting these theories:  Deputy Trejo was a uniformed peace officer engaged in the performance of his duties when he was killed.  Defendant knew he was in violation of the terms of his parole and that it was not lawful for him to possess a firearm.  After shooting Deputy Trejo, defendant and Moore quickly returned to Moore's truck and drove toward Highway 12.  The jury also found true the special circumstances that defendant killed Deputy Trejo while in the performance of his duties and for the purpose of avoiding arrest, either of which made defendant eligible for the death penalty.  (§ 190.2, subd. (a)(5) & (7).)  Thus, even assuming the trial court erred in refusing to instruct the jury on defendant's proffered accident instruction on robbery-murder special circumstance, we would still uphold the verdicts here.  (See, e.g., *People v. Suarez* (2020) 10 Cal.5th 116, 170.)

### c.   *Instructions on defendant's flight and refusal to participate in lineup*

Defendant asserts that the trial court committed prejudicial error when it instructed the jury that it could consider defendant's

refusal to appear in a lineup and his flight from the crime scene as evidence of consciousness of guilt. We conclude the instructions were proper.

The court instructed the jury with a modified version of CALJIC No. 2.06, as follows: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by refusing to participate in a line-up, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

The court also gave CALJIC No. 2.52, which states: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

Defendant asserts the consciousness-of-guilt instructions were unfairly argumentative because they invited the jury to draw inferences favorable to the prosecution from particular evidence. We have repeatedly rejected the same challenges to consciousness-of-guilt instructions involving suppression of evidence and flight. (*People v. Tully* (2012) 54 Cal.4th 952, 1024; *People v. Jurado* (2006) 38 Cal.4th 72, 125–126; *People v. Benavides* (2005) 35 Cal.4th 69, 100; *People v. Nakahara* (2003) 30 Cal.4th 705, 713 (*Nakahara*).) We perceive no reason to revisit this authority.

### d.   Use of CALJIC former No. 8.71

Defendant claims the trial court's use of the 1996 revised version of CALJIC No. 8.71, combined with the court's failure to give CALJIC No. 17.11, skewed the jury's deliberations toward first degree murder

and lowered the prosecution's burden of proof in violation of his rights to due process and trial by jury. (U.S. Const., 5th, 6th, 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.) We conclude that any error was harmless beyond a reasonable doubt.

The trial court gave the 1996 revised version of CALJIC No. 8.71, which informed the jury: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you *unanimously* agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." (Italics added.)

The trial court also provided CALJIC No. 17.40, as follows: "The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not hesitate to change an opinion if you are convinced it is wrong, however, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision. Do not decide any issue in this case by the flip of a coin, or by any other chance determination."

The court further instructed the jury with CALJIC No. 8.75, stating: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime of first degree murder as charged in Count I and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond a reasonable doubt that he is guilty of the lesser crime." The court also gave CALJIC No. 17.10, which instructs the jury that if it is not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, it may nevertheless convict him of any lesser crime if it is convinced

beyond a reasonable doubt that the defendant is guilty of the lesser crime. Additionally, the court directed the jury to read the instructions as a whole and in light of all the others; and the jury was generally instructed on reasonable doubt.

The trial court initially confirmed that it would also give CALJIC No. 17.11, which provides: "If you find the defendant guilty of the crime of murder, but have a reasonable doubt as to whether it is of the first or second degree, you must find him guilty of that crime in the second degree." However, after defense counsel informed the court that he could not find CALJIC No. 17.11 among the prepared packet of instructions to be given, the court decided that CALJIC No. 8.71 sufficiently covered CALJIC No. 17.11.

In *People v. Moore* (2011) 51 Cal.4th 386, 411–412 (*Moore*), we advised that "the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 [relating to manslaughter], as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter. The references to unanimity in these instructions were presumably added to convey the principle that the jury as a whole may not return a verdict for a lesser included offense unless it first reaches an acquittal on the charged greater offense. [Citation.] But inserting this language into CALJIC Nos. 8.71 and 8.72, which address the role of reasonable doubt in choosing between greater and lesser homicide offenses, was unnecessary, as CALJIC No. 8.75 fully explains that the jury must unanimously agree to not guilty verdicts on the greater homicide offenses before the jury as a whole may return verdicts on the lesser." Nevertheless, we determined that any error in giving these instructions was harmless beyond a reasonable doubt in light of the jury's true findings on the burglary-murder and robbery-murder special circumstances, reasoning that the jury must have found the

defendant guilty of first degree murder on the same felony-murder theory. (*Id.* at p. 412.)

We conclude, as we did in *Moore*, that any error in giving the 1996 revised version of CALJIC No. 8.71 was harmless beyond a reasonable doubt in light of the jury's true findings that defendant committed the murder for the purpose of avoiding arrest and while engaged in the commission of a robbery, and that defendant intentionally killed a peace officer engaged in the performance of his duties. (*Moore, supra,* 51 Cal.4th at p. 412.) These findings "left no room for the lesser offense[] of second degree murder." (*People v. Salazar* (2016) 63 Cal.4th 214, 247.) "Any confusion generated by the challenged instructions, therefore, could not have affected the jury's verdicts." (*Moore,* at p. 412.)

### e. *Unanimity instruction on first degree murder theory*

Defendant contends the trial court erred by failing to require unanimous agreement as to which theory of guilt the jury accepted in support of a first degree murder verdict. As we explained in *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479, premeditated murder and felony murder are not different crimes, but are instead alternate mechanisms of determining liability. Accordingly, "as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918; see also *People v. Potts* (2019) 6 Cal.5th 1012, 1048.) Defendant offers no reasoned basis for us to reconsider our previously expressed view.

### f. *Other first degree murder instructions*

Defendant alleges the trial court erred in instructing the jury on first degree murder because the amended information charged him only with "malice murder" under section 187. He claims the trial court

lacked jurisdiction to try him for the uncharged crime of first degree murder.

We have previously held that a defendant may be convicted of first degree murder even though the information charged only murder with malice in violation of section 187. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 368–370 (*Hughes*).) In *Hughes*, we rejected the defendant's premise that felony murder and malice murder are separate offenses. (*Id.* at p. 369.) Consistent with our precedent, we "reject defendant's interrelated claims that the trial court lacked jurisdiction to try him for first degree murder and improperly instructed on theories of first degree murder." (*People v. Morgan* (2007) 42 Cal.4th 593, 616 (*Morgan*).)

To the extent defendant asserts he received inadequate notice of the prosecution's theory of the case, we have explained that a defendant will generally receive such notice from the testimony presented at the preliminary hearing or at the indictment proceedings. (*Hughes, supra*, 27 Cal.4th at pp. 369–370, citing, e.g., *People v. Diaz* (1992) 3 Cal.4th 495, 557.) Here, the information alleged the special circumstance of murder in the commission of a robbery as part of the murder charge in count one, and separately charged defendant with robbery in count two; the preliminary hearing testimony made clear the prosecution's intent to establish that defendant killed Deputy Trejo with premeditation and deliberation and, alternatively, during the commission of a robbery; and the evidence at trial further alerted defendant to the premeditated murder and felony murder theories. We conclude that those allegations and that evidence provided notice that the prosecutor would proceed under premeditated-murder and felony-murder theories. (*Morgan, supra*, 42 Cal.4th at pp. 616–617.)

### g. *Reasonable doubt and related instructions*

Defendant contends the trial court denied him due process by giving several standard CALJIC instructions regarding how the jury should consider and weigh the evidence, thereby diluting the reasonable doubt standard. Specifically, defendant challenges the propriety of the following CALJIC instructions: Nos. 2.01 (sufficiency of circumstantial evidence), 2.02 (sufficiency of circumstantial evidence to prove specific intent or mental state), 8.83 (special circumstances — sufficiency of circumstantial evidence — generally), 8.83.1 (special circumstances — sufficiency of circumstantial evidence to prove required mental state), 2.21.1 (discrepancies in witness testimony), 2.21.2 (willfully false witnesses), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of testimony of one witness), 8.20 (definition of premeditation and deliberation), and 2.51 (motive).

We have previously considered and rejected similar claims challenging these same jury instructions. (See, e.g., *People v. McKinzie* (2012) 54 Cal.4th 1302, 1354–1357, abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363; *People v. Brasure* (2008) 42 Cal.4th 1037, 1058–1059 (*Brasure*); *People v. Riggs* (2008) 44 Cal.4th 248, 314; *Nakahara, supra,* 30 Cal.4th at pp. 713–715.) In *Brasure*, we determined that, "[i]n light of the entire charge, . . . none [of the challenged instructions] tends to suggest that [the] defendant bears a burden of proving his innocence or that the prosecution's burden is less than one of proof beyond a reasonable doubt. Jurors are not reasonably likely to draw, from bits of language in instructions that focus on how particular types of evidence are to be assessed and weighed, a conclusion overriding the direction, often repeated in voir dire, instruction and argument, that they may convict only if they find the People have proven guilt beyond a reasonable doubt." (*Brasure,* at p. 1059.) We conclude, as we have before, that "defendant's

63

multifaceted challenge to the court's reasonable doubt and related instructions lacks merit." (*Nakahara*, at p. 715.)

## B. Penalty Phase Issues

### 1. *Admission of evidence in aggravation under section 190.3, factor (b)*

Defendant contends the trial court erred in admitting certain evidence related to prior acts of violence during the penalty phase. He asserts that absent the allegedly inadmissible evidence, it is reasonably probable that he would not have been sentenced to death.

At the penalty phase, the jury is permitted to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) The evidence admitted under this factor must establish beyond a reasonable doubt that the conduct was prohibited by a criminal statute and satisfied the essential elements of the crime. (*Schultz*, *supra*, 10 Cal.5th at p. 681; *People v. Phillips* (1985) 41 Cal.3d 29, 72.)

### a. *Throwing urine on prison guards*

The prosecution presented evidence that defendant threw urine at several correctional officers at the Sonoma County jail. On October 13, 1996, five officers approached defendant's cell to conduct a cell search. The officers opened the cell door food port in order to handcuff defendant. Once the port was open, defendant threw a milk carton containing urine at the officers and yelled profanities at them. The substance struck three officers.

Defendant contends the trial court erred in admitting this evidence because it constituted a "technical battery" and was not a crime of force or violence under section 190.3, factor (b). Defendant is incorrect. We have held that " '[a]ny harmful or offensive touching constitutes an unlawful use of force or violence' " and is admissible

criminal activity under section 190.3, factor (b). (*People v. Pinholster* (1992) 1 Cal.4th 865, 961.) This includes throwing various items or substances at custodial officers or other persons. (*Ibid.* [throwing a cup of urine at officer]; *People v. Romero and Self* (2015) 62 Cal.4th 1, 48 (*Romero and Self*) [squirting bottle containing urine and splattering carton of feces on individual]; *People v. Banks* (2014) 59 Cal.4th 1113, 1197–1198 [throwing container filled with urine and feces at correctional officer]; *People v. Hamilton* (2009) 45 Cal.4th 863, 934 [spitting on officer]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1053 (*Lewis and Oliver*) [throwing a milk carton and hot coffee at officer]; *People v. Burgener* (2003) 29 Cal.4th 833, 868 [throwing water, urine, scouring powder, bleach, and other substances at correctional officers].) We also recently reaffirmed that "[f]actor (b) is not limited in all circumstances to acts as to which the defendant has used forcible violence or violent force." (*People v. Westerfield* (2019) 6 Cal.5th 632, 720.) We conclude the jury was permitted to consider this activity in determining defendant's sentence.

Defendant also maintains that allowing the jury to know the substance was urine was more prejudicial than probative and should have been excluded. (Evid. Code, § 352, subd. (a).) Not so. The fact that defendant, while refusing to be handcuffed for a cell search, yelled profanities at custodial officers and threw urine on them was probative of the violent nature of the act. In denying defendant's request to limit the evidence to the throwing of a liquid, the trial court elaborated: "I can't believe that you're arguing to me that urine is no more possibly caustic or dangerous or violent really than water. . . . "[T]he jury can fairly infer from the act . . . that there's a specific reason why urine is used instead of water." We conclude the court properly exercised its discretion in determining the probative value of the evidence outweighed its potential prejudice.

### b. Possession of hacksaw blades

The prosecution also presented evidence of defendant's possession of hacksaw blades while incarcerated. This was a violation of section 4502, subdivision (a), which prohibits the possession of a "dirk or dagger or sharp instrument" while confined in a penal institution. On May 1, 1984, a San Quentin correctional officer conducted a search of defendant while in custody. The officer's metal detector sounded an alarm when placed near defendant's rectum. Defendant then voluntarily removed three hacksaw blades in plastic wrap from his rectum.

Defendant asserts the trial court erroneously admitted this evidence because a hacksaw blade does not qualify as a "sharp instrument" as contemplated by section 4502, subdivision (a). Relying on a dictionary definition of the word "sharp," defendant maintains that a sharp instrument must have a "thin keen edge" and a hacksaw blade has a "fine tooth saw." In *People v. Hayes* (2009) 171 Cal.App.4th 549, 560, the Court of Appeal determined that a sharp instrument under section 4502 "does not necessarily mean the object must have a cutting blade, like a knife or razor blade," and could include a pointed object. We conclude, as did the Court of Appeal in *Hayes*, that an instrument with pointed edges, such as a hacksaw blade, qualifies as a "sharp instrument" under section 4502, subdivision (a).

Defendant also argues that his possession of a hacksaw blade does not involve an act of implied force or violence as contemplated by factor (b). Defendant relies on out-of-state decisions to support his claim. (See, e.g., *People v. Morrisette* (Ill. Ct. App. 1992) 589 N.E.2d 144, 147 [holding that a hacksaw blade is distinguishable from a "dangerous weapon" absent an accompanying act showing that the blade was used in a dangerous or violent manner].) We remain unpersuaded. We have held that "possession of a potentially

dangerous weapon in custody 'is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner.'" (*People v. Delgado* (2017) 2 Cal.5th 544, 586.) We have found that an inmate's possession of razor blades is admissible under section 190.3, factor (b) (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589), as is an inmate's possession of sharpened toothbrushes (*People v. Mills* (2010) 48 Cal.4th 158, 208). No stretch of imagination is needed to conclude that defendant's possession of three hacksaw blades, concealed in his rectum, amounts to an "implied threat to use force or violence." (§ 190.3, factor (b).) Accordingly, we conclude the trial court properly admitted such evidence under section 190.3, factor (b).

### c. *Admission of photographs*

The prosecution introduced five photographs during testimony regarding two incidents of prior acts of violence for which defendant was convicted.[7] Four of the photographs related to the 1978 sexual assault of Diane K.: three showed Diane K.'s facial injuries and one depicted defendant as he appeared around the time of the assault. The fifth photograph illustrated the injuries sustained by Louis Moody, a prison inmate whom appellant had assaulted in 1985.

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "As we have noted repeatedly, the trial court's discretion to exclude

---

[7] The prosecution introduced the convictions under section 190.3, factor (c), and subsequently argued to the jury that the evidence of the convictions and the facts of the offense be considered under both factors (b) and (c).

photographs as unduly prejudicial during the penalty phase is even more circumscribed than admission of photographs during the guilt phase . . . ." (*People v. Booker* (2011) 51 Cal.4th 141, 187.) " 'This is so because the prosecution has the right to establish [section 190.3 factors], and because the risk of an improper guilt finding based on visceral reactions is no longer present.' [Citations.] At the penalty phase, the jury 'is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light.' " (*People v. Bell* (2019) 7 Cal.5th 70, 106.)

We have reviewed the photographs. Although the photographs depicting Diane K.'s and Moody's injuries are unpleasant, they illustrated for the jury the prior acts of violence for which defendant was convicted. (§ 190.3, factors (b) & (c).) Moreover, to avoid any impression that Moody was dead in the photograph, the jury was informed that Moody's injuries were not life threatening, he was treated and released at a later date, and that he remained housed within state prison. Thus, the trial court acted within its discretion in admitting the photographs of Diane K. and Moody.

Regarding the 1978 photograph of defendant, we assume without deciding that the trial court's admission of it was erroneous, but that any such error would be harmless beyond a reasonable doubt because there is no reasonable probability that its admission affected the jury's verdict. (See, e.g., *People v. Frank* (1990) 51 Cal.3d 718, 734–735.)

### 2. *Admission of evidence in aggravation under section 190.3, factor (a)*

#### a. *Victim impact evidence from Deputy Trejo's family*

Defendant contends the trial court's admission of victim impact testimony from Deputy Trejo's immediate family members and several family photographs violated his right to a fair and reliable

penalty hearing because the evidence was so excessive, inflammatory, and cumulative that it served to unfairly sway the jury to vote for death.  Defendant also maintains the trial court should have given his proposed cautionary instruction informing the jury how to consider the victim impact evidence.  We find no error.

Over defendant's objection, the court allowed Deputy Trejo's wife and four adult children to testify during the penalty phase.  The family members described their relationship with Deputy Trejo and how their lives were impacted by his death.  Barbara Trejo, Deputy Trejo's widow, conveyed the grief and loss she felt after the death of her husband, to whom she had been married for 40 years.  Deputy Trejo's children described their close relationship with their father, who was actively involved in the lives of his grandchildren, and the sorrow they experienced as a result of their father's death.  The court also admitted five photographs illustrating Deputy Trejo's close relationship with his family.

"[V]ictim impact testimony is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*Pollock*, *supra*, 32 Cal.4th at p. 1180.)  "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*Lewis and Oliver*, *supra*, 39 Cal.4th at pp. 1056–1057.)  "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825.)

Defendant contends that allowing five family members to testify about the impact of Deputy Trejo's death was unfairly cumulative and unduly inflammatory.  "This court previously has rejected arguments

'that victim impact evidence must be confined to . . . a single witness.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 690.) "We have approved victim impact testimony from multiple witnesses who were not present at the murder scene and who described circumstances and victim characteristics unknown to the defendant" (*Pollock*, *supra*, 32 Cal.4th at p. 1183), including by a greater number of friends and family than those testifying in this case (*Romero and Self*, *supra*, 62 Cal.4th at p. 46 [testimony from six friends and family members]; *People v. Kopatz* (2015) 61 Cal.4th 62, 89 [testimony from seven family members]).  Moreover, the testimony elicited from Deputy Trejo's family members was well within the bounds of proper victim impact testimony.  (See, e.g., *People v. Scott* (2011) 52 Cal.4th 452, 466–467, 494–495.)  Thus, the trial court properly admitted the testimony.

Defendant also asserts the trial court improperly admitted the photographs of Deputy Trejo with his family on the grounds they were not probative regarding the impact of the deputy's death or necessary to humanize him, and that they were designed to elicit a purely emotional response from the jury.  Photographs of a victim may be relevant to the penalty determination because they "humanize[]" the victim, "as victim impact evidence is designed to do." (*People v. Kelly* (2007) 42 Cal.4th 763, 797.)  "Although emotion must not 'reign over reason' at the penalty phase [citations], photographs of the victims of the charged offenses are generally admissible." (*People v. Carpenter* (1997) 15 Cal.4th 312, 400–401.)

We have reviewed the photographs.  The five images included Deputy Trejo in his uniform kissing his grandchild, hugging family members at a graduation, and playing with his grandchildren.  We conclude that the photographs appropriately served to humanize Deputy Trejo and were not unduly emotional.

Additionally, defendant broadly challenges the scope of permissible victim impact evidence under section 190.3, factor (a) as

70

unconstitutionally vague and overbroad. We have previously considered and rejected this argument (*People v. Hamilton, supra*, 45 Cal.4th at p. 931), and defendant provides no persuasive reason for us to reconsider our conclusion here.

Last, defendant maintains the trial court erred when it refused to give his proposed instruction directing the jurors not to allow victim impact evidence to divert their attention from their proper role of deciding whether defendant should live or die and instructing them to face their obligation soberly and rationally. We have repeatedly rejected claims of error regarding similar cautionary instructions. (See, e.g., *Pollock, supra*, 32 Cal.4th at p. 1195 ["The proposed instruction misstated the law in asserting that the jury, in making its penalty decision, could not be influenced by sympathy for the victims and their families engendered by the victim impact testimony"].) Moreover, the standard instructions found in CALJIC Nos. 8.85 and 8.88, as given by the trial court, adequately conveyed to the jurors the proper consideration and use of victim impact evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 369.)

### b. *Victim impact evidence from Frank Cooper and Karen King*

Defendant asserts the admission of Frank Cooper and Karen King's testimony as victim impact evidence stemming from noncapital crimes violated his right to a fair and reliable penalty determination because such testimony is inadmissible under section 190.3, factor (a) or factor (b). We conclude the trial court properly admitted the testimony under factor (b), and any error with respect to admitting Karen's testimony was harmless.

Frank testified that his health had deteriorated since the hostage incident. He was unable to continue working as an auto mechanic because he was afraid to go out, and had become vigilant in keeping his home safe. Karen testified that she had become more

fearful and stressed after the incident and had trouble sleeping. Karen moved out of the family home because she was scared of the area around the house, and her relationship with her mother and children deteriorated as a result. She described the fear she felt meeting white people after the hostage incident.

Section 190.3, factor (b) permits the trier of fact to consider the presence or absence of criminal activity by the defendant involving the use or attempted use of force or violence or the express or implied threat to use force or violence. The impact of defendant's crimes on Frank and Karen were relevant and admissible under section 190.3, factor (b) as "evidence of the emotional effect" of defendant's other violent criminal acts. (See *People v. Martinez* (2010) 47 Cal.4th 911, 961; *People v. Redd* (2010) 48 Cal.4th 691, 746.) We have also concluded that the admission of such evidence does not violate the Eighth Amendment. (*Davis, supra*, 46 Cal.4th at p. 617.)

Defendant maintains that the testimony from Frank and Karen should have been excluded under Evidence Code section 352 because it was more prejudicial than probative. We disagree. That testimony was highly probative concerning the effect of defendant's criminal acts on them, and was not overly shocking or emotionally laden.

Finally, defendant argues that the trial court erroneously permitted the prosecutor to present inflammatory race-based testimony from Karen. She testified to being afraid to meet new people after the hostage incident. When the prosecutor asked whether there were any particular people that Karen was afraid to be with, Karen responded, "Caucasians."

We conclude that any error in admitting the testimony was harmless because "there is no reason to believe the prosecutor intended to elicit racial remarks or appeal to racial prejudice, or that the testimony had such an effect." (*People v. Bramit* (2009) 46 Cal.4th

1221, 1241–1242.) Karen's testimony about the issue was very brief, and there is no indication that the prosecutor capitalized on her remarks. (*Id.* at p. 1242.) Accordingly, we find no grounds for reversal of the penalty verdict based on the victim impact testimony of Frank and Karen.

### 3. *Instructions regarding aggravating and mitigating evidence*

Defendant contends the trial court prejudicially erred by refusing to give his proffered instructions relating to the scope of mitigating circumstances, the limitations on aggravating circumstances, the nature and scope of the jury's sentencing discretion, and the jury's exercise of mercy in its sentencing decision. We conclude there was no error.

#### a. *Scope of mitigating and aggravating circumstances*

At the end of the penalty phase trial, the trial court provided CALJIC No. 8.88, which defines factors in aggravation and mitigation. Defendant claims the court erred when it declined to give his proposed alternative instructions containing different definitions of the terms "mitigating factors" and "aggravating factors."

"We repeatedly have held that the standard version of CALJIC No. 8.88 is adequate and correct" (*People v. Souza* (2012) 54 Cal.4th 90, 141), and have rejected challenges based on empirical studies suggesting that the terms "aggravating," "mitigating," and "extenuating" are not sufficiently clear (see *People v. Jackson* (2009) 45 Cal.4th 662, 695). We find no persuasive reason to deviate from our prior decisions in the present case.

#### b. *Background evidence as mitigating only*

Defendant asserts the trial court should have instructed the jury that evidence of defendant's background, character, and personal history could be considered only as mitigating evidence. The court

denied the proposed instruction as duplicative of CALJIC No. 8.85, which specifies that the permissible aggravating factors are limited to those listed in the instruction and directs the jury to consider "[a]ny sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." The prosecutor also reminded the jury that it could consider only evidence that fell within the scope of factors (a), (b), and (c) as listed in CALJIC No. 8.85 as aggravating factors. Contrary to defendant's claim, the prosecutor did not suggest that defendant's background, character, or personal history could be considered as factors in aggravation. We conclude the court properly declined to give defendant's proposed instruction. (*Panah, supra,* 35 Cal.4th at p. 486 ["A trial court is not required to give pinpoint instructions that merely duplicate other instructions"].)

### c. *Mental or emotional disturbance as mitigating evidence*

Defendant contends the trial court erred in refusing to give, in addition to CALJIC No. 8.85, several special instructions offered by defense counsel regarding extreme mental or emotional disturbance as factors in mitigation. The standard version of CALJIC No. 8.85 instructs the jury to consider, among other factors, "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance" (CALJIC No. 8.85, factor (d)), and "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect" (CALJIC No. 8.85, factor (h)). It also instructs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers

as a basis for a sentence less than death, whether or not related to the offense for which he is on trial," including "[w]hether the defendant committed the offense while under the influence of a mental or emotional disturbance, which disturbance need not be extreme or amount to legal insanity or an inability to form a specific intent," and "[w]hether the defendant suffered any emotional or psychological problems as an adolescent or young adult that prevented him from acquiring necessary social skills and maturity" (CALJIC No. 8.85, factor (k)). We conclude the trial court properly rejected defendant's proffered instructions as duplicative of factors (d), (h), and (k) listed in CALJIC No. 8.85. (*People v. Jones* (2012) 54 Cal.4th 1, 74–75 (*Jones*); *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1227 [catchall provision of CALJIC No. 8.85, factor (k) "allows consideration of 'nonextreme' mental or emotional conditions"].)

### d.   Scope of jury's sentencing discretion

Defendant argues that the trial court should have given additional defense-proffered instructions concerning the scope of the jury's sentencing discretion and the weighing process. One of these instructions would have told the jury that the finding of a felony-murder special circumstance is not entitled to greater weight than the finding of any other special circumstance. Given that "[e]ach juror is free to assign whatever moral or sympathetic value [the juror] deems appropriate to each and all of the various factors he [or she] is permitted to consider" (*People v. Brown* (1985) 40 Cal.3d 512, 541), we conclude the trial court was not required to instruct the jury not to give the felony-murder special circumstance undue weight in aggravation.

Another special instruction would have advised the jury that death is a more severe punishment than life in prison without the possibility of parole. "We repeatedly have held that 'there is no legal requirement that penalty phase jurors be instructed that death is the

greater punishment, because the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty.   [Citations.]' [Citation.]  As noted, the jury was instructed that before a judgment of death can be returned, each juror 'must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.'  (CALJIC No. 8.88.)  The instruction makes it clear that 'death is considered to be a more severe punishment than life . . . .' "   (*Jones*, *supra*, 54 Cal.4th at p. 81.)   Moreover, we have repeatedly held that the CALJIC penalty phase instructions " ' "are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards." ' " (*People v. Brown* (2003) 31 Cal.4th 518, 569.)

Defendant also requested an instruction informing the jury that parole was not a possibility in this case.  The court declined, noting that it had already informed prospective jurors at the beginning of trial that jurors should assume the sentence they impose will be carried out.  The jury was also instructed with CALJIC No. 8.84, which states that "the penalty for a defendant found guilty of murder of the first degree shall be death or imprisonment in the state prison for life without the possibility of parole . . . ."  As we have frequently held, " 'the phrase "life without possibility of parole" as it appears in CALJIC No. 8.84 adequately informs the jury that a defendant sentenced to life imprisonment without possibility of parole is ineligible for parole.' "  (*Duenas*, *supra*, 55 Cal.4th at p. 28.)  We have likewise rejected defense efforts to rely on empirical studies suggesting that many death-qualified jurors do not understand that life without the possibility of parole actually means what it says (*People v. Ervine* (2009) 47 Cal.4th 745, 798 (*Ervine*)), and we do so again here.

### e. Instruction on mercy

Defense counsel requested the jury be instructed that "[i]n determining whether in light of all the relevant circumstances a sentence of death is appropriate, you may decide to exercise mercy on behalf of the defendant." "[W]e have repeatedly rejected the claim that omission of 'mercy' from the jury instructions constitutes error." (*Ervine, supra,* 47 Cal.4th at p. 801.) As noted earlier, the jury was instructed pursuant to CALJIC No. 8.85, which incorporates section 190.3, factor (k), and directs the jury to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

We conclude no additional instruction was required. "As we have previously explained, CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy. [Citation.] We therefore 'must assume the jury already understood it could consider mercy and compassion.' " (*Ervine, supra,* 47 Cal.4th at p. 801; see *Jones, supra,* 54 Cal.4th at pp. 74–75.) "To the extent the proposed instructions told the jurors they were free to consider 'mercy, sympathy and/or sentiment' . . . or 'compassion or sympathy' . . . , they were essentially duplicative of CALJIC No. 8.85 . . . ." (*Brasure, supra,* 42 Cal.4th at pp. 1069–1070.)

### C. Other Issues

#### 1. Challenges to California's death penalty law

Defendant challenges the constitutionality of numerous features of California's capital sentencing scheme. We have

repeatedly considered and rejected such challenges, and we decline to reconsider the following conclusions:

Section 190.2, which sets forth the special circumstances that render those convicted of murder death eligible, adequately narrows the class of those eligible for the death penalty and is not impermissibly broad in violation of the Eighth and Fourteenth Amendments. (*People v. Johnson* (2016) 62 Cal.4th 600, 654–655 (*Johnson*); *People v. Williams* (2013) 58 Cal.4th 197, 294; *People v. Myles* (2012) 53 Cal.4th 1181, 1224–1225.)

Section 190.3, factor (a), which instructs the jury to consider as evidence in aggravation the "circumstances of the crime," is not impermissibly broad, nor does it result in the arbitrary and capricious imposition of the death penalty. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1179–1180 (*Livingston*); *People v. Enraca* (2012) 53 Cal.4th 735, 769 (*Enraca*); *People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

The death penalty statute does not yield arbitrary and capricious sentencing because jurors need not find beyond a reasonable doubt that an aggravating factor (other than evidence under section 190.3, factor (b) or (c)) has been proved. (*Erskine, supra,* 7 Cal.5th at p. 304; *Livingston, supra,* 53 Cal.4th at pp. 1179–1180; *Enraca, supra,* 53 Cal.4th at pp. 768–769.) We have held that the high court's recent decisions interpreting the Sixth Amendment's jury trial guarantee do not alter our conclusions. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235 (*Rangel*); *People v. Lee* (2011) 51 Cal.4th 620, 651–652; see also *McKinney v. Arizona* (2020) ___ U.S. ___, ___ [140 S.Ct. 702, 708] ["*Ring* [*v. Arizona* (2002) 536 U.S. 584] and *Hurst* [*v. Florida* (2016) 577 U.S. 92 [136 S.Ct. 616]] did not require jury weighing of aggravating and mitigating circumstances"].)

Similarly, we have held that the federal Constitution does not require that the penalty phase jury make unanimous findings "regarding the existence of particular aggravating factors" (*Johnson, supra,* 62 Cal.4th at p. 655; see also *Rangel, supra,* 62 Cal.4th at p. 1235), or "findings beyond a reasonable doubt as to the existence of aggravating factors other than section 190.3, factors (b) and (c)" (*People v. Leon* (2020) 8 Cal.5th 831, 853).

"Permitting the jury to consider prior unadjudicated criminal conduct as a factor in aggravation under [section 190.3,] factor (b), and imposing no requirement that the jury unanimously find the defendant guilty of the unadjudicated crimes does not violate a defendant's right to due process or his Sixth Amendment jury trial right." (*Johnson, supra,* 62 Cal.4th at p. 656, citing *People v. Clark* (2011) 52 Cal.4th 856, 1007, *People v. Barnwell* (2007) 41 Cal.4th 1038, 1059.)

The trial court's instruction informing the jurors that they might be persuaded that the aggravating circumstances are "so substantial" in comparison with the mitigating circumstances that a death sentence is warranted is not unconstitutionally vague and ambiguous. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026 (*Frederickson*) ["CALJIC No. 8.88 is not impermissibly broad"]; *Jones, supra,* 54 Cal.4th at p. 78; *People v. Schmeck* (2005) 37 Cal.4th 240, 305.)

The trial court need not instruct the jury that (1) it must impose a sentence of life without the possibility of parole if it determines that mitigating factors outweigh aggravating factors (*Frederickson, supra,* 8 Cal.5th at p. 1027; *Jones, supra,* 54 Cal.4th at pp. 78–79); (2) its findings regarding mitigating circumstances do not need to be unanimous (*People v. Valdez* (2012) 55 Cal.4th 82, 180 (*Valdez*)); (3) it should presume life imprisonment without the possibility of parole is the appropriate sentence (*id.* at p. 179); or (4) statutory mitigating

factors are relevant solely in mitigation (*ibid.*; *Livingston, supra,* 53 Cal.4th at p. 1180).

Jurors need not make written findings on the aggravating factors found. (*Valdez, supra,* 55 Cal.4th at p. 180; *People v. Cook* (2006) 39 Cal.4th 566, 619 (*Cook*).)

"Use of adjectives such as 'extreme' and 'substantial' in section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence." (*Johnson, supra,* 62 Cal.4th at p. 656; see *People v. DeHoyos* (2013) 57 Cal.4th 79, 150.)

The trial court need not delete factually inapplicable sentencing factors from its instructions. (*Valdez, supra,* 55 Cal.4th at p. 180; *Cook, supra,* 39 Cal.4th at p. 618.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*People v. Snow* (2003) 30 Cal.4th 43, 126.)

The capital sentencing scheme does not violate equal protection by denying certain procedural protections to capital defendants that are available to noncapital defendants. (*People v. Thomas* (2012) 53 Cal.4th 771, 836.)

California's use of the death penalty does not violate international law. (*Frederickson, supra,* 8 Cal.5th at p. 1027.)

### 2. *Sentence of two enhancements on single prior conviction*

The jury found true the allegation that defendant suffered five robbery convictions under section 667, subdivision (a), and found true the allegation that defendant had served a prior prison term for those convictions and did not remain free from custody or a criminal conviction for 10 years under section 667.5, subdivision (a). The trial court sentenced defendant to a five-year enhancement for each of the

prior serious felony convictions and imposed a three-year prior prison term enhancement for the same offenses.

Defendant claims the trial court erred in imposing the three-year prior prison term enhancement under section 667.5, subdivision (a) based on the same facts — the prior conviction of a felony — and that remand for resentencing is warranted. (See *People v. Jones* (1993) 5 Cal.4th 1142, 1150–1153.) The People properly concede the error and agree the matter should be remanded for resentencing as to the prior prison term.

### 3. *Cumulative error*

Defendant contends that the cumulative effect of the asserted guilt and penalty phase errors requires us to reverse his convictions and death sentence. We have assumed error, but found no prejudice, regarding the trial court's failure to give the defendant's pinpoint jury instruction on his claim of accident relating to the felony-murder special-circumstance allegation, the admission of a photograph of defendant at the time of Diane K.'s sexual assault, and Karen King's testimony regarding her fear of "Caucasians." (See *ante*, pts. II.A.7.b., II.B.1.c., & II.B.2.b.) We have likewise found harmless error in the trial court's use of the 1996 revised version of CALJIC No. 8.71. (See *ante*, pt. II.A.7.d.) We conclude that the cumulative effect of the three assumed errors and one harmless error does not warrant reversal. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 327.)

### III. DISPOSITION

We remand the matter for resentencing on the prior prison term enhancement and affirm the judgment in all other respects.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**LIU, J.**
**CUÉLLAR , J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**JACKSON, J.**[*]

---

[*]  Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Scully

---

**Procedural Posture** (see XX below)

**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S062259
**Date Filed:**  May 24, 2021

---

**Court:**  Superior
**County:**  Sonoma
**Judge:**  Elaine M. Rushing

---

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Margot Garey and Valerie Hriciga, Deputy State Public Defenders, for Defendant and Appellant.

Kamala Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Glenn R. Pruden and Julia Y. Je, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Valerie Hriciga
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Julia Y. Je
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(415) 510-3804